Charles A. Polizzi and Angela Polizzi, Husband and Wife v. Commissioner. Charles A. Polizzi v. Commissioner.
Polizzi v. Commissioner
Docket Nos. 52715, 52716.
United States Tax Court
T.C. Memo 1957-159; 1957 Tax Ct. Memo LEXIS 91; 16 T.C.M. (CCH) 668; T.C.M. (RIA) 57159; August 14, 1957
*91 Respondent's determination of deficiencies resulting from use of increase in net worth plus expenditures method approved, subject to adjustment for cash on hand and certain other items. Amount advanced to Steel Producers, Inc., held to be an equity investment and amount of deductible loss is limited by capital loss provisions of 1939 Code. Additions to tax for fraud sustained for years 1944, 1945, 1947 and 1949, but not for the year 1950. Assessment held not barred for years 1944, 1945 and 1949 because returns were false or fraudulent with intent to evade tax and not barred for 1947 because of failure to file a return for that year. Additions to tax for failure to file declarations of estimated tax held improper because of showing that declarations were filed. Additions for underestimate of estimated tax approved. Arlene B. Steuer, Esq., and Michael E. Cozza, Esq., for the petitioners. James F. Shea, Esq., and John K. Lynch, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax of Charles Polizzi, and additions thereto under the specified sections of the Internal Revenue Code of 1939, for the *92 years and in the amounts as follows: Additions
Year
Income Tax
§ 293(b)
§ 291(a)
§ 294(d)(1)(A)
§ 294(d)(2)
1944
$13,660.52
$ 6,830.26
0
$1,564.88
$ 813.29
1945
11,345.14
5,919.73
0
2,513.10
539.04
1947
56,324.65
35,163.13
17,581.56
6,913.48
3,585.38
The respondent determined deficiencies in income tax of Charles and Angela Polizzi, and additions thereto under the specified sections of the Internal Revenue Code of 1939, for the years and in the amounts as follows: Additions
Year
Income Tax
§ 293(b)
§ 294(d)(1)(A)
§ 294(d)(2)
1949
$34,774.44
$17,387.22
$4,862.02
$1,913.51
1950
10,808.96
5,404.48
1,867.64
582.82
The petitioners contend that not only are there no deficiencies for any of the years, but that they are entitled to refunds for the years 1947 and 1949. In the petition it is claimed that for the year 1947 Charles Polizzi overpaid his tax by the amount of $655.07. By amended petition covering the year 1949 the petitioners claim that they are entitled to a business bad debt deduction in the amount of $110,000 for the year 1949, which will result in a net operating loss carryback to the year 1947, and will entitle them to refunds for the years 1947 and 1949 in the respective amounts of $13,318.93 and $18,809.06. The petitions *93 filed allege that the operation of the statute of limitations bars assessment for all years. At the hearing counsel for the petitioners conceded that the notice of deficiency for the year 1950 was timely. To avoid the bar of the statute of limitations for all years the respondent alleges that the returns were false or fraudulent with intent to evade tax. For the year 1947 the respondent further alleges that no return was filed by the petitioner Charles Polizzi, that failure to file was willful and that part of the deficiency was due to fraud with intent to evade tax. For the year 1949 the respondent also alleges the omission from the return of more than 25 percent of gross income. There are also in issue the imposition of additions to the deficiencies under section 293(b) (for fraud) for all years, under section 291(a) (failure to file return) for the year 1947, under section 294(d)(1)(A) (failure to file declarations) and 294(d)(2) (underestimation of tax) for all years. Findings of Fact The petitioners are husband and wife who reside in Cleveland, Ohio. Petitioner Charles A. Polizzi filed timely individual income tax returns for the calendar years 1944 and 1945. He did not file a *94 Federal income tax return for the year 1947. Petitioners, Charles A. Polizzi and Angela Polizzi, filed timely joint income tax returns for the calendar years 1949 and 1950. Those returns were filed with the collector of internal revenue at Cleveland, Ohio. The returns were prepared by a firm of accountants without the benefit of any books or records of the petitioners. Some of the facts were stipulated and the stipulations of fact are incorporated herein by this reference. The petitioner Charles Polizzi, hereinafter sometimes called the petitioner or Polizzi, was 61 years of age at the time of the hearing of these proceedings. He first engaged in the coal business in 1929 when he acquired a 25 percent interest in the Ray Coal Co. for which interest he paid the sum of $2,500. He has been engaged in the coal business ever since then. Among his interests in the coal business have been stock in the Trans-State Coal Company organized in 1938, in Pine Hollow Coal Company organized in 1946, and in Subar Coal Company. He also loaned money to those corporations and to Elton Mining Company. He received interest on his loans to the Trans-State and Pine Hollow companies, but not on his loans to *95 the other two. Since 1929, and through the taxable years, the petitioner has engaged in various business activities. He has been in the real estate business. He was at one time in the vending machine business. He has loaned money to individuals and to corporations engaged in varied activities. In some instances where he advanced funds to corporations he received stock; other advances were loans on some of which he received interest. During the period 1944 through 1950 he had financial interests in several enterprises in the State of Kentucky which included restaurants, bars, gambling clubs and land-holding companies. He was not active in the management of the Kentucky enterprises, and visited them only occasionally. He engaged an accountant to check the records of those enterprises to see that his interests were safeguarded. The petitioner's business transactions were almost entirely cash transactions. He had one or two banking accounts for only brief periods sometime between 1949 and 1952. Early in his experience in the coal business Polizzi had found it to be financially advantageous to pay cash. When he was engaged in the vending machine business it was his experience that the *96 people with whom he dealt would deal only in cash. These experiences convinced him that having cash on hand was of value to him in his business deals. In 1921 the petitioner was convicted of illegal possession of liquor and was sentenced to five years' imprisonment, of which he served abount 44 months. He has had no convictions since that time. The petitioners were married in 1930. Angela at that time had funds of her own in the amount of about $2,000. The petitioner at that time had $10,000 in cash. They received cash wedding gifts in the amount of about $10,000. They made it a practice to keep cash in their living quarters which at first were in an apartment. After about a year they acquired a house and at that time they purchased a combination safe which they bolted to the floor in a clothes closet in the house. They kept cash in the safe. Angela knew the combination of the safe and had access to it. No records were ever kept of the amounts of cash on hand. When the petitioner was out of the city Angela took care of payments that needed to be made by paying cash out of the safe. At one time, on telephoned instructions from the petitioner, Angela paid $40,000 in cash to Fred Smith *97 as a loan in connection with the Pine Hollow Coal Company. She obtained the cash from the safe in their home. In 1950 Angela paid $10,000 cash to John Charie in repayment of money borrowed by her husband. She tendered a check to this person, but on his request she paid him in cash. The petitioners kept cash in their safe throughout the years 1943 to 1950, inclusive. Angela never counted the full amount of cash that was in the safe at any time. Neither of them knows the amount of cash that was in the safe at any time in the period 1943 to 1950. The petitioner Angela Polizzi owned several (at least four) rental properties during some of the taxable years. She relied strictly upon her husband for decisions as to buying and selling property. Most of her wealth originated with her husband. Some of her properties were managed by an agent, and some she managed herself. She kept a record of the rents received from the rental properties. The record was not produced at the hearing. The petitioner Charles Polizzi at some time kept one or two books containing information as to his investments in, and his receipts from, companies in which he was interested. However, such records as he had were *98 destroyed prior to the hearing either when he was subpoenaed to appear before the Kefauver Committee or when he moved from one residence to another. In the early part of 1951 representatives of the respondent commenced an investigation of the income tax liability of the petitioners. During the course of the investigation the respondent's agents requested the petitioner and the accountants who prepared his returns to furnish records to enable the agents to verify the accuracy of the returns that had been filed. The only records that were made available to the agents consisted of a few checks drawn on two banks in Ohio which represented payments of various kinds of taxes and contributions, and a few ledger sheets concerning Chardon Orchards, which was a property against which the petitioners held mortgage notes. The checks that were furnished to the agents were checks drawn by Angela Polizzi. Upon the failure of the petitioners to produce books and records which reflected their income, the respondent's agents made an exhaustive investigation into the discoverable assets and liabilities and the financial transactions of the petitioners in an effort to determine as accurately as possible *99 the amounts of their incomes for the taxable years. Based on data available in the collector's office as to income taxes paid by the petitioner for years prior to 1944 and reports of other revenue agents covering their investigations for the years 1936 to 1942, the amount of the petitioner's wealth as indicated by his reported income and the agent's reports was determined as of December 31, 1943. The agents made investigations and checked records in various cities where the petitioner had had business dealings including Cleveland, Ohio, Hot Springs, Arkansas, Miami, Florida and Pittsburgh, Pennsylvania. They checked bank records. They checked brokerage house accounts both by circularization and by personal calls. They checked real estate records and ascertained whether there were mortgages or other indebtedness outstanding against properties recorded in the names of the petitioners. They listed the investments that were shown in the petitioner's returns, called at the offices or on the officers of the several companies and ascertained the amounts of his investments therein whether represented by stock or otherwise. The agents questioned the petitioner specifically as to the amounts *100 of his liabilities. He refused to give them the requested information. Based on the data collected by the examining revenue agents during their investigation into the petitioners' financial transactions, the respondent determined the net income of the petitioners for the years in question by the net worth plus non-deductible expenditures method. The details of such determination are shown in the following tabulation: Assets
12/31/43
12/31/44
12/31/45
12/31/46
1. Cash-on hand
0
0
0
0
2. Unnegotiated checks at
0
$ 140.82
$ 1,034.30
$ 6,786.40
the end of the year
3. In banks
$ 2,222.38
563.28
1,826.12
1,674.80
4. United States Savings
7,050.00
11,193.75
20,775.00
22,425.00
Bonds
5. Marketable Securities
9,589.93
14,727.95
14,727.95
17,786.75
6. Loans & Mortgages
31,700.00
11,100.00
15,500.00
27,900.00
Receivable
7. Interest Income
Contracts
Investments
8. 1913 E. 70th Street
23,108.83
24,620.04
0
Company
9. Magnetic Plastics
1,666.67
1,666.67
0
10. Corinet, Inc.
57,000.00
57,000.00
(Sno-Flake Products Co.)
11. Tucson Realty
14,740.00
12. Royal Electric Company
13. Matlux Corporation
14. Steel Producers, Inc
15. K & H Specialties
16. Victory White Metal
20,000.00
54,532.66
25,000.00
25,000.00
Company
17. Roland Realty Company
4,500.00
4,500.00
4,500.00
4,500.00
18. Accurate Lead
(689.60)
3,463.25
Engineering Co.
19. Coal Company
9,250.00
7,978.50
11,508.50
74,182.50
Investments
20. Gambling Clubs
33,270.53
31,476.26
48,619.86
46,547.65
21. Chardon Orchards
22,531.50
26,831.50
26,831.50
26,891.24
22. Real Estate
164,231.07
164,231.07
116,291.07
186,200.00
23. Automobiles
2,805.72
2,805.72
1,479.84
1,920.26
24. Household Furniture
1.00
1.00
1.00
1.00
Total Assets
$331,927.63
$356,369.22
$344,405.54
$517,018.85
Liabilities & Reserve for
Depreciation
Loans, Notes, and other
payables
25. American Savings Bank
26. Bank of Ohio
27. Belmont Hotel
28. Mortgage Loans Payable
$103,322.87
$ 97,257.70
$ 47,627.25
$113,529.97
29. Reserves for
16,673.91
23,963.48
20,104.57
6,914.37
Depreciation
Total Liabilities &
$119,996.78
$121,221.18
$ 67,731.82
$120,444.34
Reserves
30. Net Assets/RA Report
$211,930.85
$235,148.04
$276,673.72
$396,574.51
31. Less: Net Assets at
211,930.85
235,148.04
276,673.72
beginning of year
32. Annual Increase
$ 23,217.19
$ 41,525.68
$119,900.79
(decrease) in net worth
33. Less: Non-Taxable
2,558.46
26,501.14
Income
34. Balance
$ 23,217.19
$ 38,967.22
$ 93,399.65
35. Add: Expenditures for
personal, family and living
expenses; nondeductible
capital losses and
$ 18,882.42
19,698.17
42,037.72
unexplained expenditures
36. Gross Income-combined
$ 42,099.61
$ 58,665.39
$135,437.37
37. Less: Gross income
4,586.44
6,983.36
16,284.15
reported by Angela
38. Indicated Gross Income
$ 37,513.17
$ 51,682.03
$119,153.22
- Charles Polizzi
39. Charles & Angela
Polizzi
40. Less: deductions from
0
0
1,500.00
gross income
41. Indicated Adjusted
Gross Income
42. Charles Polizzi
$ 37,513.17
$ 51,682.03
$117,653.22
43. Charles & Angela
Polizzi
44. Less: Allowable
1,631.03
1,802.35
1,819.76
Deductions
Net income corrected
45. Charles Polizzi
$ 35,882.14
$ 49,879.68
$115,833.46
46. Charles & Angela
Polizzi
Less: Net Income
Reported/Income tax returns
47. Charles Polizzi
12,910.57
34,589.57
47,660.65
48. Charles & Angela
Polizzi
Net income understated
49. Charles Polizzi
$ 22,971.57
$ 15,290.11
$ 68,172.81
50. Charles & Angela
Polizzi
*101 Assets
12/31/47
12/31/48
12/31/49
12/31/50
1. Cash-on hand
0
0
0
0
2. Unnegotiated checks at
$ 21,627.88
$ 335.10
$ 223.40
$ 3,441.04
the end of the year
3. In banks
2,867.01
4,804.27
16,451.94
1,614.29
4. United States Savings
24,243.75
24,562.50
24,731.25
25,387.50
Bonds
5. Marketable Securities
6,013.43
4,503.43
4,503.43
504.93
6. Loans & Mortgages
88,250.00
72,808.33
76,708.33
70,460.90
Receivable
7. Interest Income
1,500.00
1,500.00
2,500.00
Contracts
Investments
8. 1913 E. 70th Street
Company
9. Magnetic Plastics
10. Corinet, Inc.
47,000.00
7,000.00
0
0
(Sno-Flake Products Co.)
11. Tucson Realty
14,740.00
14,740.00
14,740.00
14,740.00
12. Royal Electric Company
8,000.00
11,200.00
51,055.27
51,652.69
13. Matlux Corporation
105,000.00
105,000.00
105,000.00
0
14. Steel Producers, Inc
178,068.08
178,068.08
0
15. K & H Specialties
0
2,500.00
0
0
16. Victory White Metal
25,000.00
19,791.66
19,791.66
24,693.41
Company
17. Roland Realty Company
4,500.00
4,500.00
4,500.00
1,000.00
18. Accurate Lead
2,348.79
2,065.59
1,757.81
2,498.10
Engineering Co.
19. Coal Company
31,125.00
14,750.00
8,250.00
8,500.00
Investments
20. Gambling Clubs
56,943.51
59,657.36
91,469.06
138,653.61
21. Chardon Orchards
27,075.24
24,275.24
24,275.24
24,275.24
22. Real Estate
176,700.00
176,700.00
176,822.45
32,200.00
23. Automobiles
3,970.26
3,761.44
6,198.37
10,085.84
24. Household Furniture
1.00
1.00
1.00
1.00
Total Assets
$645,405.87
$732,524.00
$806,047.29
$412,208.55
Liabilities & Reserve for
Depreciation
Loans, Notes, and other
payables
25. American Savings Bank
$ 35,437.50
$ 16,137.78
$ 13,108.33
$ 11,946.11
26. Bank of Ohio
7,102.17
27. Belmont Hotel
1.29
28. Mortgage Loans Payable
108,188.70
102,752.35
98,416.72
7,189.00
29. Reserves for
11,195.19
14,193.53
18,218.07
9,211.84
Depreciation
Total Liabilities &
$154,821.39
$133,083.66
$136,845.29
$ 28,348.24
Reserves
30. Net Assets/RA Report
$490,584.48
$599,440.34
$669,202.00
$383,860.31
31. Less: Net Assets at
396,574.51
490,584.48
599,440.34
669,202.00
beginning of year
32. Annual Increase
$ 94,009.97
$108,855.86
$ 69,761.66
($285,341.69)
(decrease) in net worth
33. Less: Non-Taxable
8,401.04
3,275.30
5,950.00
1,000.00
Income
34. Balance
$ 85,608.93
$105,580.56
$ 63,811.66
($286,341.69)
35. Add: Expenditures for
personal, family and living
expenses; nondeductible
capital losses and
38,225.45
34,888.59
56,789.31
354,550.69
unexplained expenditures
36. Gross Income-combined
$123,834.38
$140,469.15
$120,600.97
$ 68,209.00
37. Less: Gross income
11,109.98
reported by Angela
38. Indicated Gross Income
$112,724.40
- Charles Polizzi
39. Charles & Angela
$140,469.15
$120,600.97
$ 68,209.00
Polizzi
40. Less: deductions from
1,500.00
1,500.00
1,500.00
0
gross income
41. Indicated Adjusted
Gross Income
42. Charles Polizzi
$111,224.40
43. Charles & Angela
$138,969.15
$119,100.97
$ 68,209.00
Polizzi
44. Less: Allowable
857.31
4,976.92
4,930.82
4,928.86
Deductions
Net income corrected
45. Charles Polizzi
$110,367.09
46. Charles & Angela
$133,992.23
$114,170.15
$ 63,280.14
Polizzi
Less: Net Income
Reported/Income tax returns
47. Charles Polizzi
0
48. Charles & Angela
65,097.23
54,897.24
43,385.18
Polizzi
Net income understated
49. Charles Polizzi
$110,367#09
50. Charles & Angela
$ 68,895.00
$ 59,272.91
$ 19,894.96
Polizzi
*102 The cost of the petitioner's assets determined to have been actually owned by him at the close of 1943, and used in the net worth computation, is greater by $53,000 than the amount which the respondent computed could have been available for investment as of that date, upon the basis of income returned from 1932 to 1943. Findings of Facts as to Assets In the respondent's net worth computation no amount is included at any time as undeposited cash on hand. The petitioners [1] had undeposited cash on hand as of December 31 of each of the years 1943 through 1950, in the respective amounts of $60,000, $60,000, $60,000, $45,000, $40,000, $25,000, $10,000, and $15,000. The amounts of unnegotiated checks at the end of each of the years were as determined by the respondent, except as of December 31, 1947, at which time the unnegotiated checks amounted to $5,105.80. The amounts of cash in banks which the petitioners had on hand at the end of each year were in the amounts determined by the respondent. The cost *103 of U.S. Savings Bonds which the petitioners had on hand at the end of each year was as found by the respondent. The petitioners had marketable securities on hand at the end of each of the years in the amounts of cost determined by the respondent. The amount of loans and mortgages receivable at December 31, 1943, 1944, 1945, and 1946 were as determined by the respondent. The respondent included in his net worth computation as loans owing to Polizzi by Thomas A. Lenehan at the close of the years 1946, 1947, 1948, 1949, and 1950 the respective amounts of $5,000, $4,000, $3,400, $2,800, and $2,200. At the close of the year 1946 Lenehan was indebted to Polizzi in the amount of $5,000. At the close of each of the years 1947, 1948, 1949, and 1950 Lenehan was indebted to Polizzi in the amount of $1,000. The respondent included in his net worth computation as the outstanding balance on loans by Polizzi to Charles Bernstein the amounts of $52,500 at December 31, 1947, $48,183.33 at December 31, 1948 and 1949, and $46,874.33 at December 31, 1950. During 1947 Polizzi loaned Charles Bernstein the total amount of $52,500. On December 31, 1947, Bernstein was indebted to Polizzi in the full amount *104 of the loan, $52,500. On December 31, 1948, 1949, and 1950 the amounts Bernstein owed to Polizzi on account of the loans made in 1947 were $38,637.78, $35,608.33, and $34,446.11, respectively. As of December 31, 1947, J. N. Novasel owed the petitioner $10,000, and as of December 31, 1948 and 1949, he owed the petitioner $44,068.08. Giving effect to the foregoing the correct amounts of loans and mortgages receivable as of December 31, 1947, 1948, 1949, and 1950 were $85,250, $94,930.86, $96,401.41, and $56,832.68, respectively. The petitioners had interest income contracts in the amounts of cost as determined by the respondent. The amounts of the petitioner's investments in 1913 E. 70th Street Company, Magnetic Plastics, Corinet, Inc., Tucson Realty, K and H Specialties, Victory White Metal Company, Roland Realty Company, Accurated Lead Engineering Company, Coal Companies, and Chardon Orchards, were as determined by the respondent. The petitioners had no investment in Royal Electric, Inc. in stock or otherwise at the close of 1947. At the close of the years 1948 and 1949 Polizzi owned 192 shares of stock in Royal Electric, Inc. which had a cost of $8,000. The certificate representing *105 such stock was in the name of Angela Polizzi. At the close of the years 1948, 1949, and 1950, the net amount of Polizzi's unsecured loans to Royal Electric, Inc. were $3,200, $43,055.27, and $7,084.61, respectively. At the close of the year 1950 the petitioner had an interest in mortgage notes of Royal Electric, Inc. which had a cost to him of $44,068.08. The total investment of the petitioners in Royal Electric, Inc., including stock and secured and unsecured loans as of the end of each of the years 1948, 1949, and 1950 was $11,200, $51,055.27, and $51,152.69, respectively. In the computation of the petitioners' net worth the respondent included in assets the amount of $105,000 at the close of the years 1947, 1948, and 1949 as representing the cost of stock in Matlux Corporation, a corporation organized under the laws of the State of New York. In August 1947, Polizzi purchased preferred and common stock of Matlux Corporation. His net investment was $80,000 which he retained at the end of each of the years 1947, 1948, and 1949. That corporation filed a petition for reorganization under Chapter X of the Bankruptcy Act in September 1948. Steel Producers, Inc. was organized as an Ohio *106 corporation in January 1948 for the purpose of manufacturing steel plates. It was organized pursuant to an agreement between the petitioner and Frank A. Weidman under which the petitioner and a group of associates were to make available to the corporation the sum of $350,000 to be used by it to erect a rolling mill for the purpose of producing rolled steel plates. At least a part of the amount of the contemplated funds was furnished by the petitioner's group. Steel Producers, Inc. executed its promissory note dated May 12, 1948, to petitioner, J. N. Novasel, and Mose Duberstein in the principal amount of $242,450 with interest at the rate of two percent. By the terms of the note payment was to be made in periodic installments of amounts equal to the net income of the corporation, if any, after deduction of all expenses and taxes. The note was secured by an unrecorded chattel mortgage, dated May 12, 1948, on the corporation's mill and supplementary equipment. The petitioner's share of the money furnished to Steel Producers, Inc. amounted to $144,000. His payments were made by means of deposits made by him from time to time in the checking account of J. N. Novasel at The American Savings *107 Bank Company, from which account the funds were checked out by Novasel, on instructions of Polizzi, to various suppliers of equipment and machinery to Steel Producers, Inc. Of the total deposited by Polizzi, $55,000 was made by deposits of currency. Steel Producers, Inc. ran into operating difficulties and sustained losses amounting to $240,733.83 in five months of operation ended December 31, 1948. By October 1948, Steel Producers, Inc. was unable to meet its obligations and was in need of additional funds. It borrowed $100,000 from G & S Steel Sales Corporation at that time. That corporation, as a condition to making the loan, required that the petitioner, Novasel, and Duberstein subordinate in its favor all funds due or to become due to them from Steel Producers, Inc. and particularly their rights under the chattel mortgage dated May 12, 1948. Operations of the corporation were suspended in the latter part of January 1949 by reason of lack of funds. On February 24, 1949, Steel Producers, Inc. filed in the United States District Court for the Western District of Pennsylvania a petition for reorganization under Chapter X of the Bankruptcy Act, and a trustee was appointed. The trustee *108 found no justification for the expenditure of funds in an effort for the corporation to resume operations. The district court on June 1, 1949, ordered the sale of the machinery, equipment, and assets of the corporation. The appraiser found that the rolling mill and equipment had a "sound value" of $201,235 and a "liquidation value" of $32,360. Pursuant to the orders of the court the trustee in bankruptcy in February 1950 sold the assets of the corporation for $30,000 which, after payment of sales costs, left a net amount of $28,915.36 realized from the sale. General funds of the corporation in the hands of the trustee amounted to $23,259.73 which, with the net proceeds of the sale, made a total of $52,175.09 available to pay claims against the corporation. Claims against the corporation amounted to a sum in excess of $744,000. The corporation was adjudged bankrupt on June 14, 1950. In their joint income tax return for the year 1949 the petitioners reported a long-term capital loss arising out of a mortgage of Steel Producers, Inc. which they reported as having been purchased on January 1, 1948, at a cost of $144,000. Of the loss claimed to have been sustained, $1,000 was claimed as *109 a deduction for the year 1949. [2]
The amount of $144,000 paid to Steel Producers, Inc. by Polizzi in 1948 represented an investment in stock of that corporation. The petitioner never recovered any amount on account of this investment. The investment became worthless in the year 1950. At December 31, of each of the years 1943 to 1947, inclusive, the petitioner's investments in gambling clubs were in the amounts determined by the respondent. At December 31, 1948, the petitioner's investment in gambling clubs was $4,480.02 in excess of the amount of $59,657.36 determined by the respondent, this additional amount representing the petitioner's share of the cost of land in Lawrence County, Ohio, which was acquired in 1948 by Union Enterprises, a partnership in which the petitioner had an interest. The land was acquired in the name of D. E. Corn. In addition to the purchase of land, Union Enterprises associates also loaned D. E. Corn *110 $30,000, of which petitioner loaned $4,480.02 in 1949. Thus, as of December 31, 1949 and 1950, the petitioner's investment in gambling clubs included an amount of $8,960.04 on account of the D. E. Corn transaction. In addition to the stipulated amount of $108,829.53 representing the petitioner's investment in gambling and other enterprises at December 31, 1950, the petitioner also at that time had an investment in Beverly Hills Country Club, which had a cost of $7,988.21, and an investment in Lookout House, which had a cost of $4,000. At December 31, 1950, the cost of the petitioner's investment in gambling and other enterprises amounted to $129,777.78. The cost of real estate as of December 31, 1943, 1944, and 1946 was as determined by the respondent. The cost of real estate owned by the petitioners at December 31, 1945, 1947, 1948, 1949, and 1950 was $111,291.07, $182,525.00, $173,025.00, $173,147.45, and $28,525.00, respectively. The cost of automobiles which the petitioners had on hand at the end of each year was as determined by the respondent. There is no evidence as to the cost of household furniture owned by the petitioners at the close of any of the years in question. Findings *111 of Facts as to Liabilities, Etc. The amounts owed by the petitioners to American Savings Bank, the Bank of Ohio, and the Belmont Hotel, the mortgage loans payable, and the reserves for depreciation were as determined by the respondent. In addition to the items of liabilities of the petitioners determined by the respondent in his net worth computation, there were other loans payable, consisting of $10,000 to John Charie as of December 31, 1949, and $3,000 to William Kahan as of December 31, 1949 and 1950. Expenditures of the petitioners for personal, family and living expenses were less than determined by the respondent, and were as follows: 1944
$13,882.42
1945
14,698.17
1946
37,037.12
1947
33,225.45
1948
29,888.59
1949
51,789.31
1950
35,652.75
During the year 1950 the petitioners received checks from financial institutions as follows: Date of
Date
Check
Issuer
Payee
Amount
Cleared
1/30/50
The Bank of Ohio
Charles A. Polizzi
$15,000.00
7/15/50
2/10/50
The Land Title Guarantee
Charles Polizzi &
Angela
and Trust Co.
M. Polizzi
42,125.31
2/16/50
7/14/50
The Bank of Ohio
Charles A. Polizzi
27,000.00
12/11/50
9/ 5/50
The Bank of Ohio
Charles Polizzi
5,000.00
12/11/50
12/11/50
The Bank of Ohio
Charles Polizzi
5,000.00
12/11/50 Those checks *112 were endorsed by the payees and were cashed by the payees, except the $42,125.31 check which was deposited in an account against which checks were drawn. Reconstructed Net Worth and Taxable Income Giving effect to the stipulations, testimony, and other evidence and concessions, our reconstruction of net worth and the increases therein, the correct amounts of net income and consequent understatements of income by the petitioners for the years in question are as follows: Assets
12/31/43
12/31/44
12/31/45
12/31/46
1. Cash-on hand
$ 60,000.00
$ 60,000.00
$ 60,000.00
$ 45,000.00
2. Unnegotiated checks at
0
140.82
1,034.30
6,786.40
the end of the year
3. In banks
2,222.38
563.28
1,826.12
1,674.80
4. United States Savings
7,050.00
11,193.75
20,775.00
22,425.00
Bonds
5. Marketable Securities
9,589.93
14,727.95
14,727.95
17,786.75
6. Loans & Mortgages
31,700.00
11,100.00
15,500.00
27,900.00
Receivable
7. Interest Income
Contracts
Investments
8. 1913 E. 70th Street
23,108.83
24,620.04
0
Company
9. Magnetic Plastics
1,666.67
1,666.67
0
10. Corinet, Inc.
57,000.00
57,000.00
(Sno-Flake Products Co.)
11. Tucson Realty
14,740.00
12. Royal Electric Company
13. Matlux Corporation
14. Steel Producers, Inc.
15. K & H Specialties
0
16. Victory White Metal
20,000.00
54,532.66
25,000.00
25,000.00
Company
17. Roland Realty Company
4,500.00
4,500.00
4,500.00
4,500.00
18. Accurated Lead
(689.60)
3,463.25
Engineering Co.
19. Coal Company
9,250.00
7,978.50
11,508.50
74,182.50
Investments
20. Gambling Clubs
33,270.53
31,476.26
48,619.86
46,547.65
21. Chardon Orchards
22,531.50
26,831.50
26,831.50
26,891.24
22. Real Estate
164,231.07
164,231.07
111,291.07
186,200.00
23. Automobiles
2,805.72
2,805.72
1,479.84
1,920.26
24. Household Furniture
1.00
1.00
1.00
1.00
Total Assets
$391,927.63
$416,369.22
$399,405.54
$562,018.85
Liabilities & Reserve for
Depreciation
Loans, Notes, and other
payables
25. American Savings Bank
26. Bank of Ohio
27. Belmont Hotel
28. Mortgage Loans Payable
$103,322.87
$ 97,257.70
$ 47,627.25
$113,529.97
28a. Other Loans Payable
29. Reserves for
16,673.91
23,963.48
20,104.57
6,914.37
Depreciation
Total Liabilities &
$119,996.78
$121,221.18
$ 67,731.82
$120,444.34
Reserves
30. Net Assets
$271,930.85
$295,148.04
$331,673.72
$441,574.51
31. Less: Net Assets at
271,930.85
295,148.04
331,673.72
beginning of year
32. Annual Increase
$ 23,217.19
$ 36,525.68
$109,900.79
(decrease) in net worth
33. Less: Non-taxable
2,580.46
Income
34. Balance
$ 23,217.19
$ 33,945.22
35. Add: Expenditures for
personal, family and living
expenses: nondeductible
capital losses and
13,882.42
14,698.17
unexplained expenditures
36. Gross Income-combined
$ 37,099.61
$ 48,643.39
37. Less: Gross Income
4,586.44
6,983.36
Reported by Angela
38. Indicated Gross Income
$ 32,513.17
$ 41,660.03
- Charles Polizzi
39. Charles & Angela
Polizzi
40. Less: Deductions from
0
0
Gross Income
41. Indicated Adjusted
Gross Income
42. Charles Polizzi
$ 32,513.17
$ 41,660.03
43. Charles & Angela
Polizzi
44. Less: Allowable
1,631.03
1,802.35
Deductions
Net Income Corrected
45. Charles Polizzi
$ 30,882.14
$ 39,857.68
46. Charles & Angela
Polizzi
Less: Net Income
Reported/Income Tax Returns
47. Charles Polizzi
12,910.57
34,589.57
48. Charles & Angela
Polizzi
Net Income Understated
49. Charles Polizzi
$ 17,971.57
$ 5,268.11
50. Charles & Angela
Polizzi
*113 Assets
12/31/47
12/31/48
12/31/49
12/31/50
1. Cash-on hand
$ 40,000.00
$ 25,000.00
$ 10,000.00
$ 15,000.00
2. Unnegotiated checks at
5,105.80
335.10
223.40
3,441.04
the end of the year
3. In banks
2,876.01
4,804.27
16,451.94
1,614.29
4. United States Savings
24,243.75
24,562.50
24,731.25
25,387.50
Bonds
5. Marketable Securities
6,013.43
4,503.43
4,503.43
504.93
6. Loans & Mortgages
85,250.00
94,930.86
96,401.41
56,832.68
Receivable
7. Interest Income
1,500.00
1,500.00
2,500.00
Contracts
Investments
8. 1913 E. 70th Street
Company
9. Magnetic Plastics
10. Corinet, Inc.
47,000.00
7,000.00
0
0
(Sno-Flake Products Co.)
11. Tucson Realty
14,740.00
14,740.00
14,740.00
14,740.00
12. Royal Electric Company
11,200.00
51,055.27
51,152.69
13. Matlux Corporation
80,000.00
80,000.00
80,000.00
0
14. Steel Producers, Inc.
144,000.00
144,000.00
0
15. K & H Specialties
2,500.00
0
0
16. Victory White Metal
25,000.00
19,791.66
19,791.66
24,693.41
Company
17. Roland Realty Company
4,500.00
4,500.00
4,500.00
1,000.00
18. Accurated Lead
2,348.79
2,065.59
1,757.81
2,498.10
Engineering Co.
19. Coal Company
31,125.00
14,750.00
8,250.00
8,500.00
Investments
20. Gambling Clubs
56,943.51
64,137.38
91,469.06
129,777.78
21. Chardon Orchards
27,075.24
24,275.24
24,275.24
24,275.24
22. Real Estate
182,525.00
173,025.00
173,147.45
28,525.00
23. Automobiles
3,970.26
3,761.44
6,198.37
10,085.84
24. Household Furniture
1.00
1.00
1.00
1.00
Total Assets
$638,717.79
$721,383.47
$772,997.29
$400,529.50
Liabilities & Reserve for
Depreciation
Loans, Notes, and other
payables
25. American Savings Bank
$ 35,437.50
$ 16,137.78
$ 13,108.33
$ 11,946.11
26. Bank of Ohio
7,102.17
27. Belmont Hotel
1.29
28. Mortgage Loans Payable
108,188.70
102,752.35
98,416.72
7,189.00
28a. Other Loans Payable
13,000.00
3,000.00
29. Reserves for
11,195.19
14,193.53
18,218.07
9,211.84
Depreciation
Total Liabilities &
$154,821.39
$133,083.66
$149,845.29
$ 31,348.24
Reserves
30. Net Assets
$483,896.40
$588,299.81
$623,152.00
$369,181.26
31. Less: Net Assets at
441,574.51
483,896.40
588,299.81
623,152.00
beginning of year
32. Annual Increase
$ 42,321.89
$104,403.41
$ 34,852.19
($253,970.74)
(decrease) in net worth
33. Less: Non-taxable
8,401.04
5,950.00
1,000.00
Income
34. Balance
$ 33,920.85
$ 28,902.19
($254,970.74)
35. Add: Expenditures for
personal, family and living
expenses: nondeductible
capital losses and
33,225.45
51,789.31
324,550.69
unexplained expenditures
36. Gross Income-combined
$ 67,146.30
$ 80,691.50
$ 69,579.95
37. Less: Gross Income
11,109.98
Reported by Angela
38. Indicated Gross Income
$ 56,036.32
- Charles Polizzi
39. Charles & Angela
$ 80,691.50
$ 69,579.95
Polizzi
40. Less: Deductions from
1,500.00
1,500.00
1,500.00
Gross Income
41. Indicated Adjusted
Gross Income
42. Charles Polizzi
$ 54,536.32
43. Charles & Angela
$ 79,191.50
$ 69,579.95
Polizzi
44. Less: Allowable
857.31
4,930.82
4,928.86
Deductions
Net Income Corrected
45. Charles Polizzi
$ 53,679.01
46. Charles & Angela
$ 74,260.68
$ 64,651.09
Polizzi
Less: Net Income
Reported/Income Tax Returns
47. Charles Polizzi
0
48. Charles & Angela
54,897.24
43,385.18
Polizzi
Net Income Understated
49. Charles Polizzi
$ 53,679.01
50. Charles & Angela
$ 19,363.44
$ 21,265.91
Polizzi
*114 The income tax returns filed by the petitioner Charles A. Polizzi for the years 1944 and 1945 were false and fraudulent with intent to evade tax. No income tax return was filed by the petitioner Charles A. Polizzi for the year 1947. The joint income tax return filed by the petitioners, Charles A. and Angela Polizzi for the year 1949 was false and fraudulent with intent to evade tax. At least a part of the deficiency in income tax for each of the years 1944, 1945, 1947, and 1949 was due to fraud with intent to evade tax. The petitioner Charles Polizzi filed a declaration of estimated tax and an amended declaration, showing estimated tax due for the year 1944 in the amount of $3,264. For the year 1945 he filed a declaration of estimated tax showing estimated tax due in the amount of $17,694.33. For the year 1947 he filed a declaration of estimated tax and an amended declaration, showing estimated tax due in the amount of $12,810. For the years 1949 and 1950 the petitioners, Charles A. Polizzi and Angela Polizzi, filed declarations of estimated tax showing estimated tax due in the respective amounts of $21,000 and $13,500. Opinion In these proceedings the respondent, on investigation *115 of the petitioners' returns, was unable to find any records of financial transactions by which the accuracy of income reported could be determined. Upon request for the production of records the petitioners did not produce any that were of any use. No records of their income or expenses were produced at the trial. In the absence of adequate books and records clearly reflecting income the respondent properly resorted to the use of the net worth plus nondeductible expenditures method of determining the taxable income of the petitioners and the deficiencies in income taxes. Holland v. United States, 348 U.S. 121; Carmack v. Commissioner (C.A. 5), 183 Fed. (2d) 1; Frank Imburgia, 22 T.C. 1002; Morris Lipsitz, 21 T.C. 917, affd. (C.A. 4) 220 Fed. (2d) 871. See also H. A. Hurley, 22 T.C. 1256, affd. per curiam (C.A. 6), 233 Fed. (2d) 177, in which, though books were kept, they did not clearly reflect income. The petitioners do not directly attack the respondent's use of the net worth method in these proceedings, but they insist that not only is the determination arbitrary but that the method of conducting the examination was also arbitrary. The record in this case is a long one, *116 consisting of a voluminous transcript of testimony and scores of exhibits. Throughout the record there is ample demonstration of painstaking care and patience on the part of the respondent's agents in making the investigation which led to the determination of the deficiencies. They visited the offices of the organizations in which Polizzi had interests; they examined the records that they could find and made the best interpretation they could despite the inadequacy of some and alterations in some. They corresponded with revenue officials in other jurisdictions in an effort to ascertain the facts as to Polizzi's financial transactions in those locations. They interviewed Polizzi several times, and also his accountants, and gave them every opportunity to produce records or other evidence of income and expenditures. While the evidence that was produced by the petitioners at the trial has required some modification of the respondent's determination, this is due largely to the petitioners' failure to furnish such evidence to the examining agents rather than to any arbitrary action on the part of the agents. We are firmly of the opinion that the petitioners' charge of arbitrariness is wholly *117 without foundation. The petitioners on brief state that although the deficiencies for 1944, 1945, and 1947 are assessed only against the petitioner Charles Polizzi, he has arbitrarily included in his net worth the assets and liabilities of both Angela and Charles. They state that Angela made numerous sales of real estate involving large sums of money during the years involved and that the proceeds have, in effect, been charged to Charles. It is also stated that the respondent has charged Charles with payment of Angela's income taxes but failed to give any credit to him for these payments. As we analyze the respondent's determination, he has done no more than combine the assets and liabilities of the petitioners for the purpose of determining a combined gross income. He then deducted the gross income which Angela had shown on her returns and thereby arrived at gross income attributable only to Charles. He then allowed deductions attributable only to Charles and arrived at net income of Charles only. This being true we see no reason why the respondent should give Charles credit for the taxes paid by Angela. We may add that since Angela testified that her wealth originated with her husband, *118 and that in at least one instance (Royal Electric, Inc.) her husband's investment was carried in her name, we see no error in the respondent's computation of a combined net worth, he having deducted from the determined combined gross income the amount of gross income reported by her. We approved a similar computation in William G. Lias, 24 T.C. 280, affd. (C.A. 4) 235 Fed. (2d) 879. Our reconstruction of the net worth computation discloses that the petitioners substantially understated their taxable income. The petitioners do not contend that they had nontaxable income which might account for the increases in their net worth. Such records as the petitioners had, which might have shown the source of income resulting in the understatements which we have found, were destroyed prior to the hearing, but the record shows that the petitioner was accustomed to engaging in large, numerous, and varied business activities, principally by the use of cash, and we think it is obvious that such activities are a likely source of unreported taxable income. The taxable income disclosed by our reconstruction of the net worth computation will be used in computing the deficiencies in the recomputation *119 under Rule 50. Certain items in the net worth computation and some of the contentions of the parties require discussion. Cash on Hand In his net worth computation the respondent included no undeposited cash on hand as of the beginning or end of any of the years in controversy. The petitioners attack this as being unrealistic. They contend that at January 1, 1944, there was a large amount of cash in a safe in their home and that at December 31, 1950, there was only a small amount of cash. The evidence shows that the petitioner's financial transactions were carried out almost exclusively with cash, that he did not maintain any bank accounts, except in small amounts for a brief period, that he kept a safe in his residence, and that at some time he had two safe deposit boxes. No records were kept of the cash on hand at any time in the safe or in the safe deposit boxes. The petitioners do not claim that much cash was kept in the safe deposit boxes at any time. In net worth cases it is necessary to establish, with reasonable certainty, an opening net worth to serve as a starting point from which to calculate future increases in the taxpayer's assets. See Holland v. United States, supra, *120 and Thomas v. Commissioner (C.A. 6), 223 Fed. (2d) 83. The opening net worth must, of course, include the amount of cash on hand. Obviously, also, an essential factor is the amount of cash on hand at the end of each year in controversy. If the cash on hand at the beginning and end of each year remains constant this factor has no effect upon the increase in net worth for any year. Obviously the respondent is not in a position to know how much of a hoard of cash a taxpayer may have at any time. Equally obviously he cannot adduce direct proof to show that there is no hoard of cash. This was the situation in the criminal cases, Holland v. United States, supra, and Friedberg v. United States, 348 U.S. 142. Under such circumstances the only requirement imposed upon the respondent is to make a proper investigation and to investigate relevant leads furnished by the taxpayer which are reasonably susceptible of being checked, and then make a reasonable determination upon the available evidence. The revenue agent testified that he was unable to determine the amount of cash, if any, which the petitioner had on hand at January 1, 1944. He stated that one of the reasons why no undeposited cash *121 was included was because the total net worth determined as of that date was in excess of the amount of cash that he had determined the petitioners could possibly have had on hand, based on income reported in prior years. He further testified that he found no evidence of the existence of a hoard of cash. The only persons who might be expected to have actual knowledge of the cash in the safe would be the two petitioners, both of whom had access to the safe. But both of them testified that they could not state how much cash they had on hand at any particular time. Polizzi testified that in the latter part of 1943 he had received checks in the amount of $75,000 in liquidation of an investment made earlier in that year in the P. M. Liquor Corporation. He testified that he cashed the checks and put the cash proceeds in his safe at home. He did not testify that he had that amount, or any specific amount, on hand at the end of 1943. His testimony may be summarized as follows: He had cash in the safe at January 1, 1944; he could not give an exact figure, but he had "quite a bit;" the cash fluctuated from time to time; he could not tell in dollars and cents how much cash he had at the end of *122 any particular year; he had "very little" at the end of 1949, because his investments from 1946 through 1949 took most all of his cash; he had a little cash at the end of 1950 as a result of selling some properties; he had in excess of $10,000 but not as much as $20,000 at the end of 1950; and he had less cash at the end of 1949 than at the end of 1950. Angela Polizzi testified that she never at any time counted the entire contents of the safe; that there was cash in the safe at the end of 1943, that she did not know how much, but that there was a large sum; that there could have been a large sum in 1944; that there could have been a large sum in 1945; that on one occasion she counted out $40,000 in cash taken from the safe and paid it to Fred Smith in connection with the Pine Hollow Coal Company [that company was formed in 1946], which left a substantial sum in the safe; that she thinks there was a large sum in 1947; that she does not know whether there was a large sum in 1948; that there wasn't much in 1949; that in 1950 or 1951 she paid John Charie an amount of $10,000 in cash out of the safe in repayment of a loan which her husband had contracted before 1950; that at the end of *123 1950 there was some cash in the safe, that she doesn't know how much, but that there wasn't much; and that the cash had been reduced because of investments in Steel Producers and Matlux. A financial statement which Polizzi had submitted to a bank in 1941 shows cash on hand in the amount of $8,000, and another submitted in July 1949, shows cash in the amount of $10,000. In a statement of assets and liabilities dated May 28, 1948, Polizzi did not list any cash. We think it clear that Polizzi kept a substantial amount of cash on hand in view of his large cash purchases of property and the large living costs which he incurred. We also think it reasonable to conclude that he had some cash at the beginning and end of each taxable year, and we think the respondent was in error in finding no cash on hand at those times. But the problem is that of determining the amount of cash at the vital dates. On brief the petitioners do not suggest any figures as representing the proper amounts of cash on hand at any of the crucial dates, but merely state that they had at least $75,000 in the safe at the close of 1943. As previously pointed out, Polizzi did not in his testimony state that at the end of *124 1943 he had on hand the $75,000 which he testified he had received and placed in the safe in that year. The petitioners in their proposed reconstruction of the net worth computation do not include any amounts as cash on hand at any time, stating that fluctuations in the cash on hand at any given time would account for any overstatements or understatements of income shown in their reconstruction. In view of the vagueness of the petitioners' testimony and the total lack of any records of cash, the task of finding the amounts of cash on hand at the beginning and end of each year is most difficult. Any amount found must necessarily be an estimate, and yet we feel that it is incumbent upon us to use our best judgment and make appropriate findings as to the cash on hand, based upon the evidence before us. Bodoglau v. Commissioner (C.A. 7), 230 Fed. (2d) 336, and Cohan v. Commissioner, (C.A. 2), 39 Fed. (2d) 540. We have taken into consideration the testimony of the petitioners and have given it as much weight as we think is justified. We have noted particularly the testimony as to cash on hand at December 31, 1943 and December 31, 1950, and the testimony that the cash was depleted by *125 expenditures made for the acquisition of property during the years 1946 to 1949. There apparently were no outstandingly large purchases or expenditures during the year 1944. In the year 1945 there were purchases and expenditures in large amounts, but there were also dispositions of property in large amounts. In 1946 it appears that the petitioner invested heavily with no large corresponding receipts from sales of property. In 1947 the petitioner made a large investment in Matlux Corporation and made other large investments and expenditures. In 1948 the petitioner invested heavily in Steel Producers, Inc. In 1949 the petitioner also greatly increased his investments. In 1950 the petitioner again invested heavily, but he also disposed of considerable property, principally real estate. As stated, he testified that at December 31, 1950, he had cash in excess of $10,000, but not as much as $20,000. Based upon a consideration of the whole record, we have concluded, and have found as a fact, that the petitioners had cash on hand at the end of the years 1943 to 1950, inclusive, in the respective amounts of: $60,000, $60,000, $60,000, $45,000, $40,000, $25,000, $10,000, and $15,000. These amounts *126 have been used by us in our reconstruction of the net worth computation. Loans and Mortgages Receivable Raleigh Hotel Loan. The respondent determined that the petitioner had loans and mortgages receivable at December 31, 1943, in the amount of $31,700. The parties have stipulated that at the end of 1943 the petitioner had outstanding loans receivable in the amounts of at least $20,000 due from the Raleigh Hotel, Inc., and $11,700 owing from Stella Lindsey. The petitioner claims that in addition to the Lindsey and Raleigh Hotel, Inc., loans receivable, there was owing to him the sum of $10,000 by John King, which if true would result in loans and mortgages receivable at January 1, 1944, in the amount of at least $41,700. At the hearing the petitioner testified that he did not lend any money to the Raleigh Hotel, Inc. Rather, he says that in 1940 he loaned $30,000 to one John King who needed the money in connection with the Raleigh Hotel at Miami, Florida. He testified that he sent the money by Max Marmorstein, who represented the partners in the hotel, and who also had operated properties for the petitioners. He testified that King was his life long friend and partner and that he loaned *127 him the money without interest and without obtaining a note evidencing the loan. He further stated that in 1944 he was repaid the full $30,000, plus some reimbursement of his traveling expenses, in the form of two checks, one a cashier's check of the Mercantile National Bank of Miami Beach, Florida, in the amount of $23,831.08, and the other a check given him by King in the amount of $7,200 or $7,700. The cashier's check is in evidence but there was no tender of the King check. A letter dated March 21, 1944, addressed by an attorney in Miami to the Mercantile National Bank regarding an escrow in the matter of the sale of 50 shares of capital stock of Raleigh Hotel, Inc. refers to and purports to transmit to the bank two notes of Raleigh Hotel, Inc, dated October 28, 1941, payable to the order of Charles Polizzi, each in the amount of $10,000. It is further stated in such letter that in addition to the principal, interest is due on the notes in the amount of $3,831.08. Directions were given to issue a check payable to the order of Charles Polizzi and to deliver it to either the attorney or John King. Another letter dated March 24, 1944, addressed to the Mercantile National Bank of *128 Miami Beach, Florida, and signed by John King and Joseph Slutsky in the same connection also directs the bank to draw its check to Charles Polizzi in the amount of $23,831.08 and deliver it to Polizzi or King or two other named persons. In the first place the parties have stipulated that the petitioner had an outstanding loan receivable from the Raleigh Hotel, Inc., in the amount of at least $20,000. The petitioner's testimony that the loan was made to King is basically in conflict with the stipulation, or at least leaves the record in a state of confusion. There is no evidence, except the uncorroborated testimony of Polizzi, that King owed him $30,000, or that King owed him $10,000 in addition to the $20,000 which the Raleigh Hotel, Inc. owed him, or that there was a repayment of a total of $30,000. As stated, no check was produced showing payment by King to Polizzi. Furthermore, neither King nor Marmorstein nor any other person connected with the deal was called to testify, nor was the failure to adduce corroborating proof explained in any way. Polizzi's testimony shows that he did take a very active interest in the hotel at a time when the Government took it over. He stated that *129 he was made a vice president in order to properly represent the company in its dealings with the Government and he made several trips to Miami to protect the property of the company. This testimony tends to corroborate the view that, as stipulated, Raleigh Hotel, Inc. was directly indebted to the petitioner, and might explain the failure of the petitioner to require a promissory note from King at the origin of the transaction. Under the circumstances, we are unwilling to accept the testimony of Polizzi that there was any amount owing to him in this connection in excess of the $20,000 which the respondent has already included in loans and mortgages receivable at December 31, 1943. The stipulated facts sustain the figure of $31,700 determined by the respondent and the record does not justify a finding that any additional amount should be included. Russell J. Davis. The petitioners also contend that the loans and mortgages receivable at January 1, 1944, should contain an amount of $10,000 owing them from Russell J. Davis. Polizzi testified that in 1939 Davis and Vernon Morrell asked him to participate in an insurance company; that they needed the $10,000 to secure the charter and for *130 other purposes; that he was to get a one-third interest for the $10,000; that he loaned the money to Russell J. Davis and that Davis gave him a mortgage on his home in Louisville, Kentucky; that he turned over to Davis a little over $5,000 which he had in his pocket and had his wife wire $5,000 to Davis; and that he got this money back in 1945 by cash. At the outset it is to be noted that the petitioner's testimony is somewhat confusing if not contradictory. At one time he stated that he was to have an equity interest in the company and another time he denominated the $10,000 as a loan. There is no corroboration in the record of his testimony. Neither Davis nor Morrell was called as a witness. At the hearing counsel for the petitioners stated that Davis was ill and could not appear to testify. Angela Polizzi did not testify with regard to whether she did wire $5,000 to Davis. The mortgage which petitioner states Davis gave him was not produced, nor was there any explanation of why it was not, nor were there any public records produced showing such mortgage. The petitioner's returns for the years 1943, 1944, and 1945 do not show interest received from this loan, although for 1943 and *131 1944 an item of interest "on mortgage" in the amount of $292 is shown, without further identification. For 1945 no interest on any mortgage is shown. The record shows that the revenue agents made a thorough investigation in an attempt to find all the assets of the petitioners and they requested information from the petitioners. Apparently during the investigation the petitioner did not mention this particular transaction which would have afforded the examining agents a lead by which they could have investigated the alleged facts. Under the circumstances, we are unwilling to accept the petitioner's uncorroborated self-serving testimony as showing that the respondent was in error in failing to include in his computation the amount of $10,000 claimed to be owing to the petitioner at January 1 and December 31, 1944, and January 1, 1945. Nate Weisenberg. The petitioners claim the respondent erred in not including in assets at January 1, 1944, an amount of $10,000 representing a loan made to Nate Weisenberg. Polizzi testified that he had been in partnership with Mr. Weisenberg; that aside from the partnership arrangement he loaned him $10,000 about the middle of 1942; that the loan took *132 place in the office of Alvin Giesey, who was auditor for both Mr. Weisenberg and the petitioner; that he thinks Mr. Giesey was also associated with Mr. Weisenberg in this particular deal; that he gave the money to Mr. Giesey, who gave it to Mr. Weisenberg; that he received back a note; that it was repaid in 1944; and that Mr. Weisenberg is dead. Here again the testimony of the petitioner is uncorroborated. Mr. Giesey was not called to confirm this transaction, although he was the accountant for the petitioners and, according to the petitioner's statement on brief, was in the court room during the trial. The petitioner apparently did not furnish the respondent's agents any information concerning this transaction during the course of the investigation. The petitioner's returns for 1943 and 1944 do not show the receipt of any interest received from Weisenberg. We are unwilling to accept the petitioner's testimony as establishing that an additional amount of $10,000 should be added to net worth determined by the respondent as of January 1, 1944. Thomas A. Lenehan. It has been stipulated that the petitioner loaned Thomas Lenehan an amount of $5,000 in 1946, the amount of which was outstanding *133 at the close of that year. The evidence shows, and there is no dispute, that $1,000 of that loan remained unpaid at the time of the hearing. The disagreement has to do with when the $4,000 was repaid. The respondent, on the basis of an affidavit given by Thomas A. Lenehan, determined that $1,000 was repaid during 1947 and then showed remaining balances outstanding at the end of each of the years 1947, 1948, 1949, and 1950, in the respective amounts of $4,000, $3,400, $2,800, and $2,200, apparently allocated on an arbitrary basis. An affidavit of Lenehan, which is in evidence, is confusing and might well have led the respondent to take the position he did. However, we think it is not directly in conflict with Lenehan's testimony at the trial that he repaid $4,000 of the loan to the petitioner in 1947. The petitioner himself testified that $4,000 of the loan was repaid in 1947. On the basis of the testimony of Lenehan and the petitioner we have found that at the close of each of the years 1947, 1948, 1949, and 1950 Lenehan was indebted to the petitioner in the amount of $1,000 and these amounts are reflected in our reconstruction of net worth. This results in a reduction of the total *134 amounts determined by the respondent as loans and mortgages receivable at the end of the years 1947, 1948, 1949, and 1950 by the amounts of $3,000, $2,400, $1,800, and $1,200, respectively, on account of the Lenehan loan. Charles Bernstein. In his determination the respondent included in assets as amounts owing to the petitioners from Charles Bernstein $52,500 at December 31, 1947, $48,183.33 at December 31, 1948 and 1949, and $46,874.33 at December 31, 1950. The petitioners contend that the amount of the Bernstein liability did not exceed $30,000 at the end of 1947, $16,137.78 at the end of 1948, $13,108.33 at the end of 1949, and $11,946.11 at the end of 1950. There is no issue between the parties as to the fact that Bernstein owed as much as $30,000 at the end of 1947. The respondent, to sustain his determination that there was an additional $22,500 owing at that time, introduced into evidence two cashier's checks of the National City Bank of Cleveland, one dated July 16, 1947, in the amount of $10,000, in favor of Shaker Masonry & Concrete Co., and endorsed by that company, and the other dated July 24, 1947, in the amount of $12,500, payable to Charles Bernstein and endorsed by *135 Bernstein and the Shaker Masonry & Concrete Co. The bank records show that these checks were paid for by Charles Polizzi. The respondent also introduced into evidence a transcript of a page from the general journal of the Shaker Masonry & Concrete Co., which contains an entry of December 31, 1948, showing two amounts, $10,000 and $12,500, as being amounts loaned by Charles Polizzi. This entry purports to be a correcting entry of some former entry by which these amounts had been credited to Avalon Manor Co. The evidence shows that Shaker Masonry & Concrete Co. was one of Bernstein's companies and that he had some interest in Avalon Manor Co. At the hearing the petitioner testified that he never made a loan to the Shaker Masonry & Concrete Co.; that he made no loan other than the $30,000 to Bernstein; and that at the time of the hearing the amount which Bernstein still owed him was about $11,000. However, he did not attempt to explain the purpose of the two cashiers' checks totaling $22,500 which the bank records showed he purchased and caused to be made payable to Bernstein and the Shaker Masonry & Concrete Co. Certain evidence was introduced to indicate that the bank did not always *136 identify the person who purchased a cashier's check. However, the petitioner in his testimony did not deny that he purchased these cashiers' checks. The revenue agent testified that in the course of his investigation he asked the petitioner about the loan to Bernstein, but that the petitioner would give him no answer. The revenue agent also discussed the loan with Bernstein. A subpoena was issued at the request of the respondent to require Bernstein to appear as a witness, but he did not appear. Physicians' statements were produced showing that he was ill, and it was stated that he had gone to Florida. In this state of the record we have concluded that the respondent was correct in determining that there was an amount of $52,500 owing from Bernstein to the petitioner at December 31, 1947. We think, however, that the evidence establishes that Bernstein had reduced the amount of the total loan in subsequent years in greater amounts than determined by the respondent. Bernstein did make payments directly to the American Savings Bank in payment of the $30,000 loan which Polizzi had obtained for the purpose of making the loan to Bernstein. The bank records show that the amounts owing on *137 that loan were $16,137.78 at December 31, 1948, $13,108.33 at December 31, 1949, and $11,946.11 at December 31, 1950. There is no evidence to show that any portion of the additional $22,500 was repaid. We accordingly have concluded and found as a fact that the total amounts owing to the petitioner from Bernstein at December 31, 1948, 1949, and 1950 were $38,637.78, $35,608.33, and $34,446.11, respectively. These amounts have been used by us in reconstructing the net worth computation. This results in a reduction of the total amounts determined by the respondent as loans and mortgages receivable at the end of each of the years 1948, 1949, and 1950 by the amounts of $9,545.55, $12,575.00, and $12,428.22, respectively, on account of the Bernstein loan. (It should be noted here that in his computation the respondent has properly included among the petitioner's liabilities the amounts he owed to the American Savings Bank at the end of each of the years 1947, 1948, 1949, and 1950, incurred in connection with petitioner's loan of $30,000 to Bernstein in 1947.) Interest Income Contracts and Investments It is stipulated that the petitioners had interest income contracts which cost them the *138 amounts determined by the respondent in his net worth computation. In his net worth computation under the heading "Investments" the respondent included 15 items. Many of these items have been stipulated by the parties to be in the amounts of cost as determined by the respondent. One item, "Magnetic Plastics," has been conceded by the petitioners on brief to be in the amount determined by the respondent. Another, "Real Estate," has been stipulated, the amounts for some years being in the amounts determined by the respondent, but in some years differing therefrom. The correct amounts as stipulated are set forth in our Findings of Fact. As to another item, "Gambling Clubs," the parties have stipulated that the amounts included by the respondent at the close of each of the years 1943 to 1947, inclusive, are in the amounts determined by the respondent, but a question is raised as to the proper amount of such investment as of the end of the years 1948 to 1950, inclusive. Three items, "Royal Electric, Inc.," "Matlux Corporation," and "Steel Producers, Inc.," were not the subject of stipulation. Accordingly, it will be necessary to discuss the items Royal Electric, Inc., Matlux Corporation, *139 Steel Producers, Inc., and Gambling Clubs. Royal Electric, Inc. Polizzi had a financial interest in Royal Electric, Inc., a corporation which had offices at Dayton, Ohio, and was a director. The parties agree on brief as to the amount and nature of that interest for some of the years; they differ as to others. (a) Stock Interest. The respondent in his net worth statement has included as of the end of each of the years 1947, 1948, and 1949 a stock interest at a cost of $8,000. The petitioners do not question the inclusion of this item as of the end of the years 1948 and 1949, but do claim error in its inclusion as of the end of the year 1947. The evidence is against the respondent on the point of inclusion of stock for the year 1947. Polizzi testified that he first became interested in the company in 1948 and that it was in that year that he first acquired a stock interest. There are in evidence the stock book of the company, which contains the stock certificates and the stubs, and also a transcript of the issues and transfers of stock which was prepared by an agent of the respondent. These documents show that the only stock issued in the names of the petitioners consisted of 192 *140 shares, represented by stock certificate No. 128, issued to Angela Polizzi. Those shares were transferred from Mose J. Duberstein and issued to Angela on February 13, 1948. They were transferred from Angela Polizzi to Robert E. McNett on December 4, 1950. Accordingly, in our reconstruction of the net worth computation, we have not included any amount on account of the stock for the year 1947 in view of the evidence that it was not acquired until 1948. (b) Unsecured Loans. The respondent has included in his net worth computation at the close of the year 1948 the sum of $3,200 as unsecured loans made by Polizzi to Royal Electric, Inc. This item is supported by Polizzi's testimony and listed as an unsecured loan in the brief of the petitioners. We have included it in our restatement of net worth by adding it to the stock interest in the amount of $8,000, making Polizzi's total investment at the close of 1948 $11,200, the same as the figure used by the respondent, and we have so found as a fact. The respondent has included in his net worth computation the amount of $43,055.27 as being the amount of unsecured loans owed to the petitioner by Royal Electric, Inc. at the close of the year *141 1949. Included are loans made directly by the petitioner to Royal Electric, Inc. out of his own funds as well as amounts which he loaned to Royal Electric from funds which he borrowed at The Bank of Ohio. From the briefs, it appears that the petitioners do not contest the respondent's determination as to the amounts loaned from such borrowed funds, $25,000, the amount of repayments made by Royal Electric, Inc. to petitioner during the year, $18,194.73, and some of the loans made by the petitioner out of his own funds, totaling $15,200. It appears that they dispute only five items consisting of loans of $2,000 on March 2, $50 on March 7, $500 on March 18, $3,500 on March 25, and $15,000 on April 8. The petitioner's testimony did not purport to be precise. He stated that in addition to the $3,200 which he had loaned Royal Electric in 1948, and in addition to the loans which he made from borrowings from The Bank of Ohio, he had loaned about $12,000 from his own funds. However, the records of Royal Electric, Inc., which we have carefully examined, show loans by him in the total amount determined by the respondent. One account in particular, namely, the second page of Account No. 202 sets *142 forth in detail the dates and amounts of loans made by the petitioner. Specifically, the second page of Account No. 202 of the general ledger contains notations of all amounts which are in dispute. The petitioners contend that the books are not trustworthy. They point to testimony to the effect that the books were not methodically posted, but were posted at irregular intervals by part-time help. Principally, however, they rely upon the fact that the books on their face show alterations in some items. The evidence shows that some of these alterations were made before the revenue agent examined the books and that some were made afterwards. It has not been established who made the alterations and when. However, we do not think that such alterations as appear detract from the evidentiary value of such books insofar as they relate to the loans made by the petitioner. If they do, we think it was incumbent upon the petitioners to so establish and this they have not done. We note in particular that there appear to have been no alterations made in the above referred to Account No. 202 of the general ledger. We have concluded that the unsecured loans owing to the petitioner from Royal Electric, *143 Inc. at December 31, 1949, were in the amount determined by the respondent, $43,055.27, and have accordingly found that the total investment of the petitioner in Royal Electric, Inc. at December 31, 1949, was in the amount determined by the respondent, namely, $51,055.27, consisting of the unsecured loans in the amount of $43,055.27 and the stock interest of $8,000. For the year 1950 the respondent determined that at December 31, the amount of unsecured loans owing to Polizzi by Royal Electric, Inc. was $7,584.61. That amount was arrived at by deducting from the amount of outstanding loans at December 31, 1949, which was $43,055.27, the amount of $35,470.66 determined to be the amount of payments made on unsecured loans during 1950. It appears from a computation attached to the petitioners' brief that they contend that the balance outstanding at the end of 1950 in favor of the petitioner was $6,392.67. In the same exhibit the petitioners list repayments totaling $35,970.66. We have carefully perused the records of Royal Electric, Inc. and the other evidence submitted, including certain checks drawn by Royal Electric, Inc., and have concluded that there were repayments made by Royal *144 Electric to the petitioner during the year in a total amount equal to that claimed by the petitioners. We have accordingly subtracted from the amount of $43,055.27 (the amount which we determined was the unsecured loans owing to the petitioner at the beginning of 1950), the amount of $35,970.66, which leaves unsecured loans owing to the petitioner at the end of 1950 of $7,084.61, and we have so found as a fact. (c) Secured Loans. In 1950 Polizzi received from J. N. Novasel an assignment of mortgage notes of Royal Electric, Inc. in the face amount of $90,000. The assignment was made by Novasel apparently as payment of two loans made to Novasel by Polizzi, one made in 1947 in the amount of $10,000, and the other made in 1948 in the amount of $34,000. The Royal Electric notes were paid in full by checks issued to Polizzi in 1952. In 1953 Polizzi paid to Novasel the sum of $50,000 as representing Novasel's interest in the Royal Electric notes. The respondent included in the petitioners' net worth at the close of the year 1950 the sum of $44,068.08 as representing Polizzi's cost of his investment in the mortgage notes of Royal Electric, Inc. There is testimony that Novasel was indebted *145 to Polizzi, at the time he assigned the notes, in the amount of about $44,000. The petitioners concede on brief that for lack of more definite information they would not contest the respondent's finding that for net worth purposes Polizzi's equity in the notes was $44,000. We approve the respondent's determination in this respect and have found as a fact that the secured loans owing to petitioner from Royal Electric, Inc. at December 31, 1950, amounted to $44,068.08. Adding to the amount of $44,068.08 the amount of the unsecured loans at December 31, 1950, $7,084.61, results in a total investment in Royal Electric, Inc., at the end of 1950 in the amount of $51,152.69 (the stock having been sold during 1950), and we have so found as a fact and have used that figure in our reconstruction of the net worth computation. Matlux Corporation. The evidence establishes, and the petitioner admits on brief, that he invested $80,000 in stock of Matlux Corporation in August 1947. This consisted of 625 shares of preferred stock and 375 shares of common stock. The respondent has included in his net worth statement the sum of $105,000 as being the amount of the investment in the stock of that corporation. *146 The petitioner testified that he never invested any more than the $80,000 and that there was no investment on his behalf in excess of that amount; that in the latter part of 1947 the company needed more funds; that a meeting was held to discuss the matter, attended by himself, Duberstein and Novasel; that he refused to put any more money in; that Duberstein put in $75,000 to try to save the company; that no part of the $75,000 was for him [the petitioner]; that he did not at any time give Duberstein any part of the $75,000; and that he never received back any of his investment in Matlux. Novasel also testified that the $75,000 was furnished by Duberstein and that neither he nor the petitioner furnished any of the $75,000. On November 21, 1947, Duberstein Iron & Metal Co., Inc. through a bank at Dayton, Ohio, transmitted by wire the sum of $75,000 to Matlux Corporation. Duberstein testified that the $75,000 so sent to Matlux Corporation consisted entirely of funds of Duberstein Iron & Metal Co., Inc. The books and records of Duberstein Iron & Metal Co., Inc. showed the disbursement of the $75,000 on November 21, 1947, and the bank records show the payment of the $75,000 to Matlux and *147 show that the account of Duberstein Iron & Metal Co., Inc. was charged with that amount. The records of the Duberstein Company show adjusting journal entries at June 30, 1948, debiting investment in the Matlux Corporation in the amount of $25,000, and loans receivable from J. N. Novasel and Charles Polizzi, each in the amount of $25,000. The notation accompanying the adjusting entries is as follows: "To correct entry of check of November 21, '47 to Matlux Corp. of $75,000 of which $25,000 was for purchase of stock, and advances of $25,000 each for J. N. Novasel and Charles Polizzi, for the purchase of stock in their names." The records of that company show journal entries on June 30, 1949, crediting "Investment - Jack Novasel $25,000" and "Investment - Charles Polizzi $25,000." The notation in regard thereto was "To charge off loans made which are believed to be uncollectible." The bookkeeper for Duberstein Iron & Metal Co., Inc. testified that this particular entry was never reversed thereafter. A report made by the auditor to the trustees in the matter of the application in 1948 of the Matlux Corporation for a reorganization under Chapter X of the Bankruptcy Act, which was admitted *148 in evidence as secondary evidence for the limited purpose of showing the contents of the records of Matlux Corporation, disclosed that the records of Matlux showed that on November 28, 1947, there was issued to each of Duberstein Iron & Metal Co., Inc., Charles A. Polizzi, and Jack N. Novasel 250 shares of preferred stock in the amount of $25,000. The auditor who prepared this report testified that the Matlux Corporation had no stock ledger, but that the information was obtained from cancelled stock certificates and stock record book stubs. In their income tax return for the year 1953, the petitioners reported that they had sustained a long-term capital loss in the amount of $85,000 by reason of the Matlux Corporation stock having been determined to be worthless in that year. In a financial statement signed by the petitioner, dated May 28, 1948, it is stated that his shares of stock in Matlux were "valued at" the sum of $100,000, but therein he lists his holdings as being 625 shares of preferred stock and 375 shares of common, which were the numbers of shares originally purchased by him for $80,000, and no reference is made to any additional shares of preferred stock. In this confused *149 state of the record - some of the evidence pointing one way and some the other - it is difficult to make a finding as to whether the petitioner made an additional investment of $25,000 in Matlux Corporation. We think, however, it is not necessary to reach a conclusion upon that point because if Duberstein Iron & Metal Co., Inc. did advance $25,000 on behalf of the petitioner for stock in the latter part of 1947, there would have been created an offsetting liability on the part of the petitioner to Duberstein Iron & Metal Co., Inc. in that amount. The revenue agent testified that no liability of petitioner in this respect was included in the net worth statement. There is no evidence to sustain a finding that any such loan was repaid by the petitioner during any of the years in question. What evidence there is is to the contrary. In this situation, we have found it sufficient to conclude, and have found as a fact, that the petitioner's net investment in Matlux Corporation at the end of each of the years 1947, 1948, and 1949 was $80,000 and we have used that figure in our reconstruction of the net worth computation. Steel Producers, Inc. The respondent in his determination included as *150 the petitioner's investment in Steel Producers, Inc. an amount of $178,068.08 at the end of each of the years 1948 and 1949. The petitioner attacks this as being excessive and also contends that any amount which he had "invested" constituted a loan. The evidence shows that in 1948 a total amount of $144,000 was placed by the petitioner in the bank account of J. N. Novasel in the American Savings Bank Company and that this amount was in that year paid to or on behalf of Steel Producers, Inc., in which both the petitioner and Novasel were stockholders. At a time when the income tax liability of Novasel was under investigation, both Novasel and Polizzi executed affidavits. In Novasel's affidavit it is stated that the $144,000 was the property of the petitioner, that it was deposited by the petitioner for and on behalf of Steel Producers, Inc., and that it was subsequently withdrawn by checks drawn by Novasel and paid out on behalf of and at the direction of the petitioner. In his affidavit the petitioner stated that the $144,000 was deposited by him and represented his investment in Steel Producers, Inc., that none of the funds became the property of Novasel, that Novasel's account was *151 used as a clear [ing] account by the petitioner in making his investment in Steel Producers, Inc.; that amounts were withdrawn by Novasel by checks on instructions from the petitioner and paid to suppliers of Steel Producers, Inc. and that the investment account, as shown on the books of Steel Producers, Inc., includes the amount of $144,000, representing property of the petitioner. In their income tax return for the year 1949 the petitioners showed a total longterm loss in the amount of $144,000 on "Mortgage Steel Producers," of which $1,000 was claimed as a deduction. At the hearing both the petitioner and Novasel testified that $34,000 of the $144,000 represented an advance to Steel Producers on behalf of Novasel, resulting in an obligation of Novasel to the petitioner of the $34,000. The petitioner thus claims that his total "investment" in Steel Producers was $110,000. It has been stipulated that the petitioner had advanced $10,000 to Novasel in 1947, entirely aside from the Steel Producers investment. The evidence shows that Novasel in 1950 turned over to the petitioner mortgage notes of Royal Electric, Inc. in the face amount of $90,000 in order to repay the petitioner a total *152 amount of $44,000 which Novasel owed petitioner, that Royal Electric, Inc. in 1952 paid the petitioner $90,000 in satisfaction of such notes, and that petitioner kept $40.000 thereof and transferred the remaining $50,000 to Novasel by cashiers' checks in 1953. We are satisfied that Novasel did owe the petitioner the total of $44,000, but the question is whether $34,000 thereof was a part of the $144,000 item, or whether this represented an amount loaned to Novasel wholly aside from the $144,000 item. The petitioner's testimony is somewhat confusing and contradictory. While he testified on direct examination that of the $144,000 an amount of $34,000 did not represent his own investment, but an advance on behalf of Novasel, on cross-examination he testified: "Q. How much did each member of the Cleveland group put in? "A. Well, I put in $144,000 myself, and I think Mr. Novasel - I am guessing at this figure - put in about $70,000, around in there, I think. I am just guessing." Novasel testified that he put about $70,000 in Steel Producers, that he borrowed most of it, some from the petitioner. In view of the contradictions between the testimony of the petitioner and Novasel and their *153 affidavits and in the confused state of the record, we cannot accept the testimony of petitioner and Novasel as establishing that the $144,000 did not represent funds paid by the petitioner on his own behalf. We have concluded and found as a fact that the petitioner's investment in Steel Producers, Inc. was $144,000 instead of $110,000 as claimed by the petitioner, or $178,068.08 as determined by the respondent. The difference between the $144,000 and the $178,068.08 figure, we believe, represents a loan owing to the petitioner from Novasel and we have accordingly, in our reconstruction of the net worth computation, increased the item "Loans and Mortgages Receivable" as of the end of each of the years 1948 and 1949 by the amount of $34,068.08. The amount of $10,000 which Novasel also owed the petitioner was included by the respondent in his net worth computation under "Loans and Mortgages Receivable" as of the end of each of the years 1947, 1948, and 1949. The respondent did not include as of end of the year 1950 any amount owing to petitioner from Novasel, but included as a part of the petitioner's investment in Royal Electric, Inc. an amount of $44,068.08 as the cost of petitioner's *154 interest in the $90,000 face amount of Royal Electric, Inc. notes, as previously discussed herein, and approved by us. (a) Claimed Loss on Steel Producers, Inc. The petitioners now contend that they are entitled to deduct $110,000 (the amount claimed to have been paid in to Steel Producers, Inc.) from gross income for the year 1949 on the ground that that amount was fully a deductible business bad debt under section 23(k)(1) of the Internal Revenue Code of 1939. This issue was raised by amended petition. As previously stated, the petitioners, on their 1949 return, reported $144,000 as a long-term capital loss on account of this item. The respondent has treated the worthlessness as having occurred in 1950. He contends that Polizzi's advances to Steel Producers, Inc. was a capital contribution rather than a bona fide loan. If he is correct in this view, any loss sustained by the petitioners on account of the worthlessness of their investment is properly to be treated as a loss from the sale or exchange, on the last day of the year, of capital assets (section 23(g), Internal Revenue Code of 1939), and the amount of the deduction is limited under section 117(d)(2). The question of whether *155 Polizzi's payments to the corporation were loans and resulted in a debtor-creditor relationship, or whether they were capital contributions and created a proprietary interest in the corporation is a question of fact. Sam Schnitzer, 13 T.C. 43, 60, affd. per curiam (C.A. 9), 183 Fed. (2d) 70. The primary consideration is whether there was an intention to create a debtor-creditor relationship on the one hand, or to make a capital contribution on the other hand, and such intention is to be gleaned from the entire record. Colony, Inc., 26 T.C. 30, affd. on another issue (C.A. 6) 244 Fed. (2d) 75. In decisions on this question, the courts, as we said in Gooding Amusement Co., 23 T.C. 408, 418, affd. (C.A. 6) 236 Fed. (2d) 159, have been careful not to lay down any all-embracing rule of general application, but have invoked and relied upon certain criteria, none of which is, by itself, determinative of the ultimate fact question. Among the factors taken into consideration in the numerous decisions are whether repayment is certain or contingent (Commissioner v. O.P.P. Holding Corp. (C.A. 2), 76 Fed. (2d) 11, affirming 30 B.T.A. 377; Commissioner v. Page Oil Co. (C.A. 2), 129 Fed. (2d) 748, *156 affirming 41 B.T.A. 952; Washmont v. Hendricksen (C.A. 9), 137 Fed. (2d) 306), whether there was a definite obligation to pay a fixed sum ( Bakers' Mutual Cooperative Assn. of Newark v. Commissioner (C.A. 3), 117 Fed. (2d) 27, affirming 40 B.T.A. 656; Staked Plains Trust v. Commissioner (C.A. 5), 143 Fed. (2d) 421, whether there is a fixed maturity date (Commissioner v. H. P. Hood & Sons, Inc. (C.A. 1), 141 Fed. (2d) 467, affirming a decision of this Court [1 TCM 262,]; Industrial Addition Assn. (C.A. 6), 149 Fed. (2d) 294, affirming 1 T.C. 378, Mullin Building Corporation, 9 T.C. 350, affd. per curiam (C.A. 3), 167 Fed. (2d) 1001, whether the rate of so-called interest is dependent on earnings, ( Talbot Mills, 3 T.C. 95, affd. (C.A. 1), 146 Fed. (2d) 809, 326 U.S. 521, and the relation of the amount of capital invested to the size of the debt structure ( Swoby Corporation, 9 T.C. 887, Colony, Inc., supra.) Considering the facts herein established in the light of the above factors, we are convinced that the $144,000 paid in to Steel Producers, Inc. by Polizzi represented a capital contribution by him which was put at the risk of the business and not a loan to the *157 corporation. Under the terms of the instrument issued to Polizzi, Novasel and Duberstein, any payment to them was wholly contingent upon the "amount of the net income, if any," of the corporation, after deduction of all expenses and a reserve for taxes. Thus, there was no definite obligation to pay a fixed sum, a factor which is usually regarded as necessary in order to create a debt. The instrument did not bear a fixed maturity date, but was to run until such time as the stated principal and the interest thereon had been fully paid out of earnings. The relation of the amount of the formal capital of the corporation to the amount of funds necessary for the corporation to embark on the business for which it was organized is a strong indication that the promoters recognized that the larger amount represented by the alleged loan would necessarily be risked in the business. The pre-organization agreement between Polizzi and his associates, and Weidman and his group provided that the capitalization of the corporation was to be 1,000 shares of no-par value stock. The record indicates that not more than $3,500 was actually paid in on stock subscriptions. In the same agreement Polizzi agreed *158 on behalf of his group to make available to the corporation $350,000 as purported loans. This demonstrates a clear undercapitalization of a corporation set up to engage in a commercial business in which capital is an important factor. In the case of Isidor Dobkin, 15 T.C. 31, 33, affd. (C.A. 2), 192 Fed. (2d) 392, where the relation was $6,500 in notes to $500 for capital stock in the case of each stockholder, we said: "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. Cohen v. Commissioner, 148 Fed. (2d) 336; Joseph B. Thomas, 2 T.C. 193. The formal characterization as loans on the part of the controlling stockholders may be a relevant factor but it should not be permitted to obscure the true substance of the transaction. Sam Schnitzer, 13 T.C. 43, 60." It is our opinion, and we so hold, that there was no debtor-creditor relation between Steel Producers, Inc. and Polizzi, from which it follows that Polizzi is not entitled *159 to a bad debt deduction. Even if the amount of $144,000 were held to constitute a debt, we think there would be a serious question as to whether it constituted a business bad debt deductible in full under section 23(k). An individual, to be entitled to a deduction of a business bad debt, must show that the loss resulting from the debt becoming worthless bears a proximate relation to a trade or business in which he was engaged in the year in which the debt became worthless. See S. D. Ferguson, 28 T.C. - (May 23, 1957), and authorities cited therein. As stated, the respondent held that the worthlessness occurred in 1950. However, the petitioner contends that the worthlessness occurred in 1949. The petitioner testified that he had given up hope of recovery in 1949. In that year the bankruptcy court had ordered a sale of the assets apparently upon the basis of the trustee's statement that he found no justification for the expenditure of funds in an effort for the corporation to resume operations. However, throughout 1949 the matter of possible reorganization was still before the bankruptcy court and it was not until 1950 that the assets were actually sold. The corporation was not adjudicated *160 bankrupt until June 14, 1950. While the petitioner testified that in 1949 he had given up hope of recovery, this is not the decisive test of the year in which the loss was sustained. The test is not merely a subjective one. The question is one of fact to be decided upon the basis of all the circumstances. Bochm v. Commissioner, 326 U.S. 287. It is well established, of course, that there must be some identifiable event as the basis for the deduction of a loss on stock of a corporation. Generally that identifiable event is a sale or an exchange, but there may be some other identifiable event which clearly evidences that a loss has been sustained. Gowen v. Commissioner (C.A. 6), 65 Fed. (2d) 923. In the instant case we have concluded that there was no identifiable event fixing the worthlessness of the investment prior to 1950 when the assets were sold and the corporation was actually adjudicated bankrupt. See Jeffery v. Commissioner (C.A. 6), 62 Fed. (2d) 661, and O. H. Himelick, 32 B.T.A. 792. We have accordingly found as a fact that the worthlessness occurred in 1950 as held by the respondent, rather than in 1949. (b) Adjustment for Capital Losses. The respondent in his net worth *161 computation included among assets at January 1, 1950, the full amount of $144,000, but that amount was climinated as an asset as of December 31, 1950. (The difference of $34,068.08 between the $178,068.08 and $144,000, was not eliminated but was retained by the respondent in his computation as an asset at December 31, 1950, under the item "Loans and Mortgages Receivable.") This, of course, under the net worth method, would have the effect of offsetting otherwise taxable income and would amount to the allowance of a deduction of the full amount. To compensate for this, and in order not to distort the computation of taxable income by the net worth method, it is necessary to add to the increase in net worth for 1950 that portion of the $144,000 which did not constitute a proper deduction. In his net worth computation the respondent has added to the amount of the increase in net worth computed by him for 1950 an item entitled "Expenditures for Personal, Family and Living Expenses; Nondeductible Capital Losses and Unexplained Expenditures" in the amount of $354,550.69. The portion of such amount stated by the respondent as representing nondeductible capital losses is $233,250.36. There *162 is no explanation of this figure, but as stated, we note that in his net worth computation the respondent eliminated from closing net worth for 1950 the item of $144,000 on account of Steel Producers and he also eliminated the amount of $105,000 on account of Matlux Corporation, a total of $249,000. The difference between that amount and the amount added back is about $15,750. We also note that in their return for the year 1950, the petitioners showed capital gains of $15,700.66 and that they claimed a deduction of $1,000 in addition thereto. In his net worth computation the respondent allowed the deductions from adjusted gross income claimed by the petitioners, including the $1,000. Thus, it appears that the respondent has allowed the deduction of capital losses to the extent of capital gains, plus $1,000, as required by sections 23(g)(1) and 117(d)(2) of the Internal Revenue Code of 1939. The petitioner directs no attack whatever to this portion of the $354,550.69 adjustment above referred to. However, in view of our holding that the investment in Matlux Corporation at the end of 1949 was $80,000 instead of $105,000, in our reconstruction we have added to increase in net worth for *163 1950 an amount of $208,250.36, representing nondeductible capital losses, instead of $233,250.36, the figure used by the respondent, thus giving effect to the $25,000 difference between the $80,000 and the $105,000. Gambling and Other Enterprises. Under the caption of "Gambling Clubs" the respondent has included as assets substantial sums in his net worth computation for each year from 1943 to 1950, inclusive. The parties have stipulated to a joint exhibit which is a schedule by individual properties and by years "detailing the cost of petitioner Charles A. Polizzi's investments in certain gambling enterprises and certain other enterprises at the close of each of the taxable years 1943 through 1950, inclusive." The totals shown in the joint exhibit for the years 1943 to 1947, inclusive, are the same amounts as shown in the respondent's net worth statement under the caption "Gambling Clubs." The totals shown in the joint exhibit for the years 1949 and 1950 are somewhat less than the amounts shown in the respondent's net worth statement. The items as to which there remains some controversy will be discussed. (a) D. E. Corn Transaction. On brief the parties are in agreement that Polizzi's *164 share in the D. E. Corn transaction was $8,960.04. The respondent says that it was an indebtedness which should be included in assets for the years 1949 and 1950. The petitioner contends that it was an asset on hand at the close of 1948 as well as for the years 1949 and 1950. According to the testimony, a group from Union Enterprises, in order to avoid possible competition, arranged to have D. E. Corn purchase a tract of land in Lawrence County, Ohio, which was near a club that was operated by Union Enterprises. Polizzi owned an interest in Union Enterprises which was a partnership. The Union Enterprise group advanced to Corn $30,000 with which to make the purchase, and loaned him an additional $30,000. On June 26, 1948, Corn acquired title to the tract of land under a sheriff's deed, which recites that the sheriff has received $30,000 from Corn. On May 1, 1949, Corn gave a promissory note to A. E. Gordon, Trustee (presumably for the benefit of the Union Enterprise group), in the amount of $60,000 with a mortgage on the Lawrence County land as security. In 1952 Gordon, the trustee, issued certified checks to several persons, one of which checks was in favor of the petitioner in the *165 amount of $4,390.42. The petitioner did not make any direct contribution towards financing the Corn transaction, but testified that his share of the advances to D. E. Corn was charged to and paid from his distributive share of the earnings of the Kentucky enterprises in which he was interested. It is not clear from his testimony whether he meant to state that his full share was paid in 1948. At one point he testified that his share of the initial payment to purchase the land, which was made to Corn, was something less than $5,000. He did not testify specifically as to when the $30,000 additional loan was made. He did not furnish any documentary evidence to show when the payments were made. We note that it was not until May 1, 1949, that Corn gave his promissory note for $60,000 and a mortgage on the property. Under the circumstances, we have had to use our best judgment and have concluded that one-half of the petitioner's total investment, namely, $4,480.02, was made in the year 1948, and that the remaining one-half was made in 1949. Accordingly, we have found as a fact that at December 31, 1948, the petitioner had an investment in gambling clubs in the amount of $4,480.02 in addition *166 to the amount of $59,657.36 determined by the respondent. Furthermore, we approve the respondent's inclusion of the amount of $8,960.04 as a part of the petitioner's investment in gambling clubs at December 31, 1949 and 1950. The inclusion of that amount at December 31, 1949, results in the same figure for gambling clubs as was used by the respondent in his net worth computation. (b) Beverly Hills Club. In the stipulation, the petitioner's investment in Beverly Hills, Inc. is shown in the amount of $7,988.21 at the close of each of the years 1944 to 1949, inclusive. No amount is shown at the close of the year 1950. The petitioners ask us to find an amount of $6,847.77 as representing Polizzi's interest at December 31, 1950, in Beverly Hills Country Club which was the partnership successor of Beverly Hills, Inc.
It appears from the testimony that in May 1950, four of the stockholders in Beverly Hills, Inc., who owned about 41 percent of the stock sold their stock to the corporation. The corporation continued the operation of the club properties until November 19, 1950, when the operation of the business was taken over by a partnership, Beverly Hills Country Club. The partnership took *167 over the assets of the corporation and assumed its liabilities. The petitioners arrive at the figure of $6,847.77 as Polizzi's investment at December 31, 1950, by this process of reasoning: Polizzi had an eight percent interest in the corporation; when the 41 percent of stock was retired in May 1950, his interest was reduced to eight percent of the remaining 59 percent (58.428 percent is the precise figure) which is equivalent to 13,692 percent of the capital and paid-in surplus. This percentage of the total of the partners' capital accounts as shown in the partnership return in the amount of $50,013.77 amounts to $6,847.77, according to the petitioners' computation. Ergo, that amount should be carried in the December 31, 1950, net worth statement. In a net worth computation assets are to be shown at cost. We must assume that when the parties stipulated that the petitioner's investment in stock in Beverly Hills, Inc. was $7,988.21 they used a cost figure. That cost of the corporate interest was not changed when the corporation redeemed the stock of other stockholders, nor is there any evidence to show that such redemption changed the relative value of the petitioner's interest. Apparently *168 the corporation did not go out of existence but a partnership comprised of the stockholders succeeded to the restaurant business and operated it. The evidence does not establish the fair market value of any assets which the petitioner may have received upon a liquidation or a partial liquidation of the corporation and hence we do not know whether he suffered a loss or realized a gain at the time of the transformation of the business. Under the circumstances, we conclude that his investment in the partnership as of the end of 1950 should be considered as having the same cost as his interest in the corporation. We have found as a fact that the petitioner's interest in Beverly Hills Club had a cost of $7,988.21 at December 31, 1950, and we have included that figure in our reconstruction of the net worth computation. This is in addition to the total stipulated amount of the petitioner's investments in gambling clubs and other enterprises at December 31, 1950, in the amount of $108,829.53. This investment in Beverly Hills Country Club is in addition to a note of Beverly Hills, Inc., in the amount of $2,000, which it has been stipulated that the petitioner held at December 31, 1950, and *169 which is included in the stipulated figure of $108,829.53. (c) Lookout House. The situation with respect to this investment parallels that of Beverly Hills. It has been stipulated that the petitioner's investment in Lookout House, Inc. was $4,000 at the close of each of the years 1944 to 1949, inclusive. The organization was a corporation in which the petitioner had an interest which he testified was 9.85 percent. In May 1950, the corporation bought the stock of three stockholders who owned 36.915 percent of the stock. Petitioner retained his stock in the corporation. In November 1950, a partnership, of which the petitioner was a member, took over the operation of the business of the corporation. The name of the corporation was Lookout House, Inc. The name of the partnership was Lookout House. The state of the evidence with regard to this transaction is similar to that with regard to the Beverly Hills transaction. For the reasons there stated, we have concluded and found as a fact that the cost of the petitioner's investment in Lookout House at December 31, 1950, was $4,000, and we have included that amount in our reconstruction of the net worth computation. This is in addition to *170 the total stipulated investment of the petitioner at December 31, 1950, in gambling and other enterprises, $108,829.53. It was also stipulated that there was a note of Lookout House owing to the petitioner at December 31, 1950, in the amount of $9,850, which forms a part of the total stipulated amount of $108,829.53 invested in gambling and other enterprises at December 31, 1950. The respondent contends that his determination of $138,653.61 as the investment in gambling and other enterprises at December 31, 1950, should be approved. However, from a consideration of all the evidence, including the stipulation, we have concluded, and have found as a fact that the total of the petitioner's investments in gambling and other enterprises at December 31, 1950, was $129,777.78, consisting of the amounts of $108,829.53 (stipulated), $8,960.04 (D. E. Corn transaction), $7,988.21 (Beverly Hills Club), and $4,000 (Lookout House). We have used that total in our reconstruction of the net worth computation. Liabilities The parties have stipulated as to mortgage notes payable by the petitioners at the close of each of the years 1943 to 1950, inclusive, amounts owing to the Bank of Ohio at the close *171 of 1949, and to the Belmont Hotel at the close of 1950, and as to the reserves for depreciation, all in the same amounts as determined by the respondent. The evidence shows, and the parties are agreed on brief, that the amounts owed to the American Savings Bank at the close of the years 1947 to 1949, inclusive, are the same as determined by the respondent in compiling his net worth statement. Consequently, as to these items no change has been made in our reconstruction of net worth. Other Loans Payable. The petitioners ask us to find as facts that in addition to the amounts payable heretofore commented on, Polizzi was indebted as follows: to John Charie in the amount of $10,000 at the close of 1949; to Nick Satullo in the amount of $5,000 at the close of 1948, and $15,000 at the close of 1949 and 1950; to William Kahan in the amount of $3,000 at the close of 1949 and 1950; and to Russell J. Davis in the amount of $10,000 at the close of 1949 and 1950. The petitioner testified that he borrowed these amounts totaling $38,000 in 1949 (except for $5,000 borrowed from Satullo in 1948), but his testimony as to each was very brief. He did not state why it was necessary to borrow the money, *172 the purpose for which it was to be used, the contemplated terms of the loans, whether notes and security were given, whether they were time or demand loans, or whether interest was charged and paid. In the case of the claimed Davis loan there was no corroboration whatever. Angela Polizzi testified that she knew her husband borrowed the two amounts from Satullo, but her testimony is also brief and she apparently did not know any details - she did not remember whether the loans were made in 1947, 1948 or 1949. Satullo testified as to the two loans, stating that the payments and repayments were in cash, that notes were given but were returned to the petitioner upon payment in 1951. He did not state whether interest was charged. Detracting from the probative value of his testimony is the fact that he had been convicted of uttering a forged instrument. Kahan's testimony, while somewhat confusing as to the details of the transaction, is to the effect that he loaned the petitioner $3,000 in 1949, that a demand note was given, and that repayment was made October 19, 1955. Here again there was no reference to whether interest was charged or paid. Angela Polizzi testified that she knew her husband *173 borrowed $10,000 from John Charie some time before 1950 and that she repaid Charie by cash from the safe. She stated that she tried to pay him by check but that he wanted cash. There was put in evidence a check stub (which had been cancelled by pencil marks) purporting to show a check drawn on February 16, 1950, to John Charie in the amount of $10,000. The testimony of the revenue agent would seem to indicate that John Charie had, in the course of the investigation, confirmed that there had been a loan at some time. Charie had died before the time of the hearing. There is no record or documentary evidence supporting any of the claimed loans, except the cancelled check stub above-referred to, nor did the petitioners give any explanation of the lack of any written evidence of the loans. We have examined the income tax returns of the petitioners for the years 1949 and 1950. Therein no deductions were claimed for interest paid to any of the above parties, although interest deductions were claimed on certain other obligations. It would seem improbable that the petitioner could borrow the total amount here claimed for extended periods without interest. And it would also seem improbable that *174 if interest was paid the petitioners would not claim the benefit of deductions. We also think it improbable that the petitioner would allow his loans to run for as long a period as claimed. As set forth in our Findings, the petitioners received in 1950 checks in a total amount in excess of $90,000. One check in the amount of $15,000 was received in January and was not cashed until July, another in the amount of $27,000 was received in July and was not cashed until December, and another in the amount of $5,000 was received in September and was not cashed until December. This indicates to us that the petitioner was not in need of the particular borrowed funds to which he has testified. Furthermore, it would seem that if he had such outstanding liabilities during 1950, he would have been more prompt in cashing the checks which he received and paying off such liabilities. In the unsatisfactory state of the record we think a finding that the petitioner owed all the amounts claimed would not be justified. We have exercised our best judgment in the circumstances and have concluded, and found as a fact, that the only outstanding obligations of the petitioners, in addition to those determined *175 by the respondent, were $10,000 owing to John Charie at December 31, 1949, and $3,000 owing to William Kahan at December 31, 1949 and 1950. We have included those amounts in our reconstruction of the net worth computation under an added caption, "Other Loans Payable." Non-taxable Income There is no evidence as to the amount of non-taxable income for any of the years. However, for each of the years in question the respondent has given the petitioners the benefit of non-taxable income in amounts either as large as, or greater than, the amounts claimed by the petitioners on brief. In our reconstruction of the net worth computation we have used the amounts determined by the respondent. Additions to the Increase in Net Worth The parties have stipulated amounts as representing "certain of petitioners' expenditures for personal, family and living expenses" for each of the years 1944 through 1950. The amount stipulated for each year is $5,000 less than the amount determined by the respondent and used in his net worth statement. We have used the stipulated figures in our reconstruction of the net worth statement for the years in question. In the respondent's net worth statement he used the *176 figure of $354,550.69 for the year 1950 as being "Expenditures for personal, family and living expenses; non-deductible capital losses and unexplained expend." That gross amount of $354,550.69 is made up of the following items: Personal, family and living expenses
$ 40,652.75
Non-deductible capital losses
233,250.36
Other expenditures
80,647.58
Total
$354,550.69 Of the foregoing three items the first has been reduced by stipulation to $35,652.75 and is not in dispute; there is no attack directed to the second, but we have made an adjustment in that item as described in our discussion of the item "Steel Producers, Inc.," the third one is vigorously contested by the petitioners. The revenue agent testified that the $80,647.58 item was included because of the fact that the petitioner had received the checks set forth in our Findings of Fact, and because the disposition of the proceeds thereof could not be traced. He testified that it was made up partly of the $27,000 check and the $42,125.31 check described in the Findings and which are in evidence. He said that he had also added in the amount of the two $5,000 checks. All these checks to which he refers add up to $79,125.31, which is $1,522.27 *177 less than the item in question. There is, however, the additional check for $15,000, as set forth in our Findings of Fact. Counsel for the petitioners on brief refer to one $5,000 check as being in evidence as exhibit MM. The document marked MM is a $15,000 check drawn by the Bank of Ohio to the order of the petitioner. We assume that the petitioners intended to refer to the $15,000 check. The petitioners strenuously contend that the action of the respondent in adding this amount to the increase in net worth was arbitrary and should be eliminated from the calculation. They rely heavily upon the testimony of the revenue agent on cross-examination to the effect that the agent could not trace the money, that it could have been used towards living expenses, or toward the increase of the net worth in that year, and that this item could be a duplication in whole or in part. Of course, duplication of expenditures must be avoided in applying the net worth method. Cf. United States v. Caserta (C.A. 3), 199 Fed. (2d) 905. However, throughout his testimony the revenue agent stated that he did not know that there was any duplication for the reason that the amounts could not be traced. The respondent's *178 determination of tax liabilities is prima facie correct and the burden of proof of showing error therein is upon the petitioner. Thomas v. Commissioner, supra; Carmack v. Commissioner, supra; Joseph V. Moriarty, 18 T.C. 327, affd. per curiam (C.A.D.C.) 208 Fed. (2d) 43; Anthony Delsanter, 28 T.C. - (July 18, 1957); Rule 32 of the Rules of Practice of this Court. See also Hoefle v. Commissioner (C.A. 6), 114 Fed. (2d) 713. Concededly, the burden of proof as to the deficiency for the year 1950 is upon the petitioners. Here the respondent has determined that the $80,647.58 item was a proper addition to the net worth increase for the year 1950. The evidence clearly shows that checks in excess of that amount were received, and the record sustains the conclusion that substantially that amount was expended. Certainly the proceeds of the checks were not on hand at the end of the year in the form of bank deposits, since it has been stipulated that the bank deposits at the end of the year were only $1,614.29. And we have found, consistently with the petitioner's testimony, that at the end of 1950 he had cash on hand in no greater amount than $15,000. We see nothing arbitrary about the *179 action of the respondent in this respect. It was not possible to trace the disposition of these funds. The inability to trace the flow of funds is due to the petitioners' failure to keep proper records as required by section 54, Internal Revenue Code of 1939. The petitioners were in the best position to know how these funds were expended. If used to defray personal living expenses or to purchase assets which were included by the respondent in closing net worth for 1950, we think they should have been able to so demonstrate. They have not adduced any evidence whatsoever to show the source of the funds or their disposition. Nor have they intimated that proof could not be adduced. In any event, if it was not possible to meet their burden by reason of lack of records, it would be due to their own failure to keep proper records. See Anthony Delsanter, supra. In this respect the respondent's determination must be approved. Accordingly, we have made no adjustment in the respondent's determination with regard to the $80,647.58 item. Addition to Tax for Failure to File Return for the Year 1947 Section 291(a) of the 1939 Internal Revenue Code imposes an addition to the tax, in a maximum amount *180 of 25 percent thereof, for failure to file a return within the prescribed time. The respondent has added the maximum amount to the deficiency for the year 1947. The addition has been made on the ground that no return has been filed by Charles Polizzi for the year 1947. A pencil draft of a return for Polizzi for the year 1947 was presented in evidence by him, which states that there was an overpayment of tax in the amount of $655.07. This exhibit does not purport to have been filed but was the pencil draft which was prepared by the accounting firm which customarily prepared the returns for the petitioners. A member of that firm testified that this document was prepared by him and that in accordance with the customary procedure such document was typed in duplicate and mailed to the petitioner for signature. He pointed out also that in accordance with custom, there were dates shown on this pencil copy which show that he prepared the typed returns on February 10, 1948, and mailed them to the petitioner on February 17, 1948. Both he and the petitioner testified as to the customary procedure. It was the usual practice of Polizzi to sign the typed returns and return them to the accountants *181 who either mailed or delivered them to the collector's office. The accountant testified that dates of preparation and mailing to clients were always noted in order that the firm might have a complete record. From this we would infer that normally the pencil copy is retained by the accounting firm. In the case of this particular document the petitioner testified that he had it in his possession. This probably is accounted for by the fact, as stated by the accountant, that during the time of the Kefauver Committee investigation the records belonging to the various clients had been returned to such clients. The accountant testified that he did not remember filing a return for the petitioner for the year 1947, and insofar as the record shows the accounting firm has nothing in its files to show that the petitioner ever returned the typed return to the accountants for filing or that such return was ever filed. It would seem probable that at the due date for the filing of the return for 1947 the accounting firm had this pencil draft in its possession. Furthermore, since its custom was to both prepare and file the returns, and since it was its custom to keep a complete record it might reasonably *182 be expected that there would be a notation on the pencil copy to show the date it was filed by the accounting firm, if it were so filed. There is no such notation on this pencil copy. The petitioner testified that he signed a typed copy of a return for 1947 and that it was filed. He did not state whether he filed it or whether the customary procedure was followed of returning the original return to the accountant for filing. If the usual practice was followed, we fail to see how the petitioner could have knowledge of the actual filing. Representatives of the respondent testified that a search was made of the respondent's files but that no return for 1947 was located. Furthermore, such records of the respondent contain a notation that no return was filed for 1947. Under the circumstances we have been compelled to the conclusion that the petitioner did not file a return for 1947 and we have so found as a fact. Since the petitioner's position at the trial was that he had filed a return, he did not put in any evidence as to the existence of any reasonable cause for failure to file, which, under the provisions of section 291 (a) might avoid the assertion of an addition to the tax for failure *183 to timely file. Under the circumstances we have no choice to approve an addition to the tax for failure to file a return for the year 1947. Statute of Limitations and Fraud The petitioners plead the bar of the statute of limitations as to all years involved. However, the petitioners now concede that assessment and collection of any tax and additions thereto for the year 1950 are not barred by the statute of limitations. The respondent, to overcome the bar of the statute of limitations, asserts that the returns filed were false and fraudulent within the meaning of section 276(a) of the Internal Revenue Code of 1939. [3] The respondent has also determined that the petitioners are liable for additions to the tax for each year for fraud, under section 293(b) of the 1939 Code. [4] *184 In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax the burden of proof in respect of such issue is upon the respondent. Section 1112 of the Internal Revenue Code of 1939. It is not necessary that the respondent prove the precise amount of the deficiencies but he must prove that at least some part of the deficiency for each year was due to fraud with intent to evade taxes. Fraud is never presumed, but must be established by clear and convincing evidence. Kashat v. Commissioner ( C.A. 6), 229 Fed. (2d) 282; Drieborg v. Commissioner (C.A. 6), 225 Fed. (2d) 216; Arlette Coat Company, 14 T.C. 751; W. A. Shaw, 27 T.C. 561; Frank Imburgia, supra.
To establish fraud by direct proof of intention is seldom possible, and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. M. Rea Gano, 19 B.T.A. 518; Lashells Estate v. Commissioner (C.A. 6), 208 Fed. (2d) 430; and Rogers v. Commissioner (C.A. 6), 111 Fed. (2d) 987. In *185 deciding whether the respondent has established fraud we may consider the entire record properly before us and are not limited to the respondent's affirmative evidence on the fraud issue. Wallace H. Petit, 10 T.C. 1253; L. Schepp Co., 25 B.T.A. 419; Frank Imburgia, supra. There are many authorities which hold that a taxpayer's consistent and substantial understatement of income over a period of years, taken together with other circumstances, can constitute clear and convincing evidence of fraud. Holland v. United States, supra; Kashat v. Commissioner, supra; Rogers v. Commissioner, supra; Drieborg v. Commissioner, supra; Halle v. Commissioner (C.A. 2), 175 Fed. (2d) 500; Kurnick v. Commissioner, 232 Fed. (2d) 678 (C.A. 6); Epstein v. United States (C.A. 6), - Fed. (2d) -; Jack M. Chesbro, 21 T.C. 123, affd. (C.A. 2) 225 Fed. (2d) 674; Arlette Coat Co., supra; and W. A. Shaw, supra.In Epstein v. United States, supra, the court stated: "* * * The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 681; Drieborg v. Commissioner of Internal Revenue, 225 Fed. (2d) 216 (C.A. *186 6). In Holland v. United States, supra, 139, The Supreme Court declared that 'evidence of a consistent pattern of underreporting large amounts of income' will support 'an inference of willfulness'." And in Schwarzkopf v. Commissioner (C.A. 2[3]), - Fed. (2d) -, the court stated that even though the usual indicia of fraud are absent the consistent failure to report substantial amounts of income over a number of years standing alone is effective evidence of fraudulent intent. In the instant case the parties have stipulated, to a substantial degree, the items properly includible in the net worth computation. As to others there have been certain concessions. As to still others voluminous testimony was adduced, all as discussed hereinabove. All items which we have included in our reconstruction of the net worth computation have been established by one or the other of these means, except one item for 1950 which will be later discussed, and except for the item "Household Furniture," which the respondent has included at $1.00 as of the close of each of the years. As to that item no evidence was adduced by either party and neither party makes a point of it on brief. We think it may fairly *187 be assumed that this item is not a significant one in the whole computation. As has hereinbefore been pointed out, if the cost of a particular item remains constant throughout the period under consideration, it has no effect upon the increase in net worth. We think it fair to assume that whatever amount the petitioners had invested in household furniture probably remained substantially constant throughout the whole period. Our reconstruction of the net worth computation discloses that the correct net income of the petitioners for the years 1944, 1945, 1947 and 1949 amounted to $198,679.51. The total which they reported for those years was $102,397.38 (no return being filed for 1947). The total understatement of net income for those years was therefore $96,282.13. Taking into consideration the fact that both of the petitioners were intelligent persons and that the petitioner Charles Polizzi was an experienced businessman, these substantial understatements, coupled with the failure to keep proper records as required by law, the destruction, prior to the hearing, of such records as were kept, the almost exclusive dealing in cash, and in some instances the carrying out of transactions *188 through bank accounts in the names of others, are in our opinion clear and convincing evidence that at least some part of the deficiency for each of the years 1944, 1945, 1947, and 1949 is due to fraud with intent to evade tax and we have so found as a fact. Willful intent to evade the tax may exist even though a return is not filed. See Fred N. Acker, 26 T.C. 107. We hold that the petitioners are liable for additions to the tax, pursuant to the provisions of section 293(b), for the years 1944, 1945, 1947, and 1949. For the reasons set forth above, we are also of the opinion that the returns for the years 1944, 1945, and 1949 were false and fraudulent with intent to evade tax, and we have so found as a fact. Accordingly, assessments and collections of any deficiencies for those years are not barred by the statute of limitations, nor are assessment and collection of tax and additions thereto for the year 1947 barred, since no return was filed for that year. It is unnecessary to consider the respondent's additional contention raised in his answer that, pursuant to section 275(c) of the 1939 Code, the statute of limitations does not bar assessment and collection of taxes for the year *189 1949 because of the petitioners' omission from their return of gross income in an amount in excess of 25 percent thereof. In our reconstruction of the net worth computation for the year 1950 we have found that the petitioners' understatement of net income was in the amount of $21,265.91 and the computation of the deficiency in tax should be based upon our computation. As stated, there is no question as to the statute of limitations as to that year. The respondent has, however, determined an addition to tax on account of fraud for that year. Included among additions to the increase in net worth for the year 1950, as set forth in our reconstruction of the computation, is an item of unexplained expenditures described in some detail hereinablve. We have held that for purposes of the computation of the deficiency this item should be included since the petitioners have not shown error in the respondent's determination in this respect. On the other hand, the respondent has not clearly and convincingly established that this item is properly to be added to the increase in net worth. The revenue agent stated that he was unable to trace the expenditures. Neither on direct examination nor cross-examination *190 was the petitioner asked to explain the use to which this cash was put. If this item were eliminated from the net worth computation it would result in a complete elimination of any understatement of net income by the petitioners in the return for the year 1950. Since fraud is never presumed, the failure of a taxpayer to overcome the presumptive correctness of a deficiency does not aid the Commissioner in his burden to prove fraud. Kashat v. Commissioner, supra; Dricborg v. Commissioner, supra. Under the circumstances, we hold that the petitioners are not liable for an addition to tax under section 293(b) for the year 1950. The respondent determined additions to the tax under section 294(d)(1)(A) for each of the years in controversy for failure to file declarations of estimated tax. In this he was in error, since the record establishes that a declaration of estimated tax was filed for each of such years. The respondent also determined additions to the tax under section 294(d)(2) for substantial underestimate of estimated tax for each of the years in controversy. We have set forth in our Findings of Fact the amounts of estimated tax which the petitioners declared. Whether and to what *191 extent the petitioners underestimated their estimated tax, and the proper amounts of additions to tax on account thereof will be computed by the parties under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. The term "petitioners" as herein used means Charles A. Polizzi, individually, for the years 1944, 1945, and 1947, and Charles A. and Angela Polizzi, jointly, for the years 1949 and 1950.↩
2. The loss of $144,000 was offset by capital gains in the amount of $14,300, which left a net long-term capital loss of $129,700. of which $64,850 (50%) was reported as the recognizable loss, and $1,000 was claimed as a deduction, with a carry-over of $63,850.↩
3. Sec. 276(a)↩. False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. 4. Sec. 293(b). Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed. collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).